People v Baber (2020 NY Slip Op 02294)





People v Baber


2020 NY Slip Op 02294


Decided on April 16, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: April 16, 2020

110046

[*1]The People of the State of New York, Respondent,
v
Scott Baber, Appellant.

Calendar Date: February 13, 2020

Before: Garry, P.J., Lynch, Mulvey, Aarons and Reynolds Fitzgerald, JJ.


Theresa M. Suozzi, Saratoga Springs, for appellant.
Jason M. Carusone, District Attorney, Lake George (Rebecca Nealon of counsel), for respondent.



Garry, P.J.
Appeals (1) from a judgment of the County Court of Warren County (Hall Jr., J.), rendered January 5, 2018, upon a verdict convicting defendant of the crimes of strangulation in the second degree, assault in the second degree and assault in the third degree (two counts) and the violation of harassment in the second degree, and (2) from an order of said court, entered April 17, 2018, which set the amount of restitution owed by defendant.
In June 2017, defendant assaulted his girlfriend (hereinafter the victim) in the Town of Lake George, Warren County, and then assaulted her again several days later. He was charged with strangulation in the second degree, assault in the second degree, assault in the third degree (two counts) and harassment in the second degree. Following a jury trial, he was convicted as charged and sentenced to consecutive prison terms of seven years each upon the convictions for strangulation in the second degree and assault in the second degree, followed by three years of postrelease supervision, with lesser concurrent terms for the remaining convictions. After a hearing, County Court ordered defendant to pay restitution in the sum of approximately $20,000 for the victim's medical expenses. Defendant appeals from the judgment of conviction and from the restitution order.
Defendant asserts that his convictions for assault in the second degree and strangulation in the second degree are not supported by legally sufficient evidence and are against the weight of the evidence. Specifically, he argues that the victim's testimony was not consistent and credible enough to prove the elements of these convictions and, further, that the People failed to prove that he intended to cause injury to the victim, that he strangled her or that a telephone that he threw at her was a dangerous instrument (see Penal Law §§ 120.05 [2]; 121.12). Defendant's general motion to dismiss at trial was not "specifically directed" at any of the errors now raised upon appeal;[FN1] thus, his legal sufficiency claims are unpreserved for appellate review (People v Gray, 86 NY2d 10, 19 [1995] [internal quotation marks and citation omitted]; see People v Harris, 177 AD3d 1199, 1200 [2019]). Nevertheless, his assertion that his convictions are against the weight of the evidence requires us to determine whether each element of the crimes was proven beyond a reasonable doubt (see People v McCollum, 176 AD3d 1402, 1403 [2019]; People v Secor, 162 AD3d 1411, 1412 [2018], lv denied 32 NY3d 941 [2018]).
At trial, the victim testified that she and defendant had previously lived in Florida and had a tempestuous romantic relationship. After a brief separation, the victim accepted defendant's invitation to reunite and relocate with him to Lake George. They moved there in early June 2017 and lived in a room at a resort motel. The victim testified that, on the evening of June 15, 2017, she and defendant drank alcohol at a gathering in the motel office with the owner, his wife and several other employees, and then returned to their room. They began to argue, and defendant became enraged, called the victim several profane names and then hit her in the crease of her eye and the corner of her mouth, causing her to bleed. The victim called the motel owner's wife, told her that defendant was "not in a right state of mind" and tried to leave the room. Before she could do so, defendant grabbed her and they fell to the floor, with the victim on her back and defendant on top of her, "slamming [the victim's] head against the floor." The victim managed to escape and left the room.
A motel employee testified that he was working at this time in a tool room located directly below the room of the victim and defendant. He heard them arguing, heard defendant call the victim profane names, and heard the victim say, "[G]et off me. This hurts. Don't touch me. Get away from me." He testified that defendant's speech was slurred, that he sounded "very angry," and that the victim sounded "very worried and panicked." The employee heard pounding on the floor that he described as "something bigger [than feet] like bodies hitting the floor." There was a "huge thud" followed by silence for about 15 seconds. When the altercation resumed, the employee went to the office and told the owner's wife what he had heard. She directed him to go back to the room and give the victim a cell phone that she had left behind. The employee did so and encountered the victim outside the room, bleeding and "crying her eyes out." He gave the victim her phone, told her that he "[had] her back," and returned to the office to inform the motel owner's wife.
The victim testified that defendant had begun throwing her possessions out of the room. Believing that help was on the way, she picked up some of her belongings and took them inside, where she found that defendant was angrier than before. When she tried to leave, he intercepted her and they fell to the floor, with the victim face down and defendant on top of her. Defendant told the victim that he was going to kill her, put his hands around her neck and closed his fingers so tightly around her throat that the victim could not scream or breathe. She testified that she passed out and that, when she regained consciousness, defendant was "jerking" the hair on the back of her head and calling her name, sounding "scared . . . that he had actually killed [her]." Defendant got off the victim and she got up, scrambled onto a bed, backed into a corner and kicked defendant away as he tried to approach her. Defendant then yanked the room telephone out of the wall and threw it at the victim, striking her in the left eye and causing blood to "pour[]" from her face. At the sight of the blood, defendant calmed down, tried to comfort the victim and allowed her to leave the room.
The victim went to the office and banged on the door until the motel owner's wife answered. The wife offered to call the police, but the victim declined. The wife gave the victim ice and found her another room to spend the night. Once in this room, the victim took cell phone pictures of her injuries; these were later admitted into evidence at trial. She testified that her face felt as if it was "on fire," that the vision in her left eye was impaired, and that her throat hurt when she swallowed or turned her head. Her injured eye was swollen and "blew up," becoming much more swollen when she blew her nose.[FN2]
The employee who had brought the phone to the victim testified that, later that night, he received a call from defendant requesting cigarettes and rolling papers, which the employee took to his room. The employee described the room as looking as if "a tornado went through there," with a lamp knocked over and blood on the bedding. The employee testified that the room telephone was missing, and that defendant told him that he had thrown a phone at the victim. The following morning, the victim left her room and encountered a different employee, who testified that the victim's face was "demolished" and "black and blue from her hairline down to probably her lip." This employee told the motel owner's wife that the victim needed medical assistance, and the wife arranged to have the victim taken to the hospital.
The victim testified that she did not tell hospital personnel the truth about the assault because she did not want police to go to the motel. Instead, she told them that she had been strangled and assaulted by a stranger, and she refused their offer to call police. A nurse and physician's assistant who treated the victim testified that she was complaining of a headache, neck pain, facial injuries and back pain, as well as vision difficulties. She was diagnosed with a fracture of the orbital wall of her left eye, a concussion and a thoracic sprain; CAT scans revealing the eye injury were admitted into evidence. A physician's assistant testified that the victim's eye injury was consistent with suffering a blow to the eye, that her complaints of a hoarse voice, pain, swelling and neck tenderness were consistent with being choked, and that the location of a bruise on her neck was consistent with having been strangled to unconsciousness. A radiologist described the victim's eye injury as "serious" and stated that, without appropriate treatment, it could have resulted in infection, permanent vision loss or death. He opined that the injury could have been caused by a telephone thrown at the victim's face.
The victim testified that defendant picked her up at the hospital when she was discharged, and that she went with him because she had no money and nowhere else to go. He took her to another motel in the area, where he had obtained lodging that day.[FN3] For the next several days, the victim remained at the motel because she was embarrassed to be seen with her facial injuries. According to the victim, defendant treated her well at first, but eventually began to argue with her about her reluctance to leave the room. After one such argument, defendant left and returned later, intoxicated and angry.[FN4] Defendant began to break beer bottles and then struck the victim with an open hand in the injured eye, causing what the victim described as "take-your-breath-away type of pain." She went to the motel office and asked the owner for help. This owner testified that he had previously seen the victim on the deck outside her room and had noticed that her face was badly bruised and swollen; defendant had told him that the victim had been in an automobile accident. The victim told the owner what had occurred that day and at the first motel. She did not initially want to call the police, but the owner did so after speaking with the owner of the first motel. A police officer who was called to the scene testified that the victim told him that defendant had caused her injuries and described the incidents at both motels. The officer called an ambulance for the victim and then arrested defendant, who was in his room, intoxicated and asleep.
Medical personnel who treated the victim after the second incident testified that she told them that defendant had caused her injuries on both occasions. She complained of throat and neck pain, as well as pain in the eye; medical personnel observed old bruises on her face, as well as redness consistent with a new injury. A CAT scan revealed no worsening of the facial fracture.
Defendant testified on his own behalf, claiming that he and the victim had gone out to several bars after the gathering at the office on June 15, 2017, and that he had seen the victim have an altercation with an unknown man in which she was not injured. Defendant went back to the motel without the victim; he said that when she returned, she had a carpet burn, a scratch, scabs and a small mark on her left eye. Defendant admitted that he called the victim names and that there was a struggle in which she ended up on the bed, but he denied that he knocked her to the ground, restricted her from leaving, or placed his hands on her throat. He stated that the victim screamed at him and threw a cell phone at him, striking him in the mouth, and that he threw it back. He acknowledged that the phone had caused the victim's eye injuries but stated that he did not intend to hit her and denied that he had thrown the motel room telephone, rather than a cell phone. As for the second incident, defendant testified that he returned to the room after an absence to find the victim intoxicated and the room in disarray. Exasperated, he gave the victim money, told her to buy a ticket to return home and then went to a nearby bar, where he had four to five drinks. He admitted that he and the victim argued after he returned and that he threw beer bottles, but denied that he put his hands on her or caused any injuries.
If the jury had credited defendant's account, a different verdict would not have been unreasonable; accordingly, this Court must "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Creech, 165 AD3d 1491, 1492 [2018] [internal quotation marks and citations omitted]; see People v Bleakley, 69 NY2d 490, 495 [1987]). Inconsistencies in the victim's testimony as to such matters as dates, times and room numbers were "thoroughly explored on cross-examination and presented credibility questions to be resolved by the jury" (People v Chaneyfield, 157 AD3d 996, 1000 [2018], lv denied 31 NY3d 1012 [2018]). Based upon the victim's testimony and the medical evidence, the jury could reasonably have concluded that defendant strangled her (see People v Pietoso, 168 AD3d 1276, 1278-1279 [2019], lv denied 33 NY3d 1034 [2019]; People v Hilton, 166 AD3d 1316, 1318 [2018], lv denied 32 NY3d 1205 [2019]). Likewise, the evidence permitted the inference that defendant had the requisite intent to commit both crimes (see People v Williams, 161 AD3d 1296, 1298 [2018], lv denied 32 NY3d 942 [2018]; People v Robinson, 158 AD3d 1263, 1265 [2018], lv denied 32 NY3d 1067 [2018]). The weight of the evidence supports the conclusion that defendant threw the motel room telephone, rather than a cell phone, at the victim; further, the telephone was a "dangerous instrument" within the meaning of the Penal Law because the evidence established that, used in that manner, it was "readily capable of causing death or other serious physical injury" (Penal Law § 10.00 [13]; see Penal Law § 120.05 [2]; People v Ryder, 146 AD3d 1022, 1024-1025 [2017], lv denied 29 NY3d 1086 [2017]). Deferring to the jury's credibility determinations and viewing the evidence in a neutral light, we find that the verdict is supported by the weight of the evidence (see Penal Law §§ 121.12, 120.05 [2]; People v Ryder, 146 AD3d at 1024-1025; see generally People v Bleakley, 69 NY2d at 495).
County Court did not err in allowing the People to amend the indictment shortly before the beginning of the trial. "At any time before or during trial, the court may, upon application of the [P]eople and with notice to the defendant and opportunity to be heard, order the amendment of an indictment with respect to defects, errors or variances from the proof relating to . . . time . . ., when such an amendment does not change the theory or theories of the prosecution as reflected in the evidence before the grand jury which filed such indictment, or otherwise tend to prejudice the defendant on the merits" (CPL 200.70 [1]). Here, the original indictment asserted that defendant's first assault upon the victim took place on June 15, 2017. About two weeks before the commencement of the trial, the People sought leave to amend it to provide that the incident occurred "on or about" June 15, 2017, on the ground that the initial date had been an approximation and that subsequent investigation had narrowed down the time to the late evening hours of June 15, 2017 and/or the early morning hours of June 16, 2017. The amendment did not alter the theory of the prosecution; the People consistently maintained, both before the grand jury and at trial after the amendment, that defendant strangled and assaulted the victim in their room after the gathering in the motel office and before her first treatment at the hospital on the morning of June 16, 2017. The amendment merely served to address the possibility that the incident began in the evening of June 15, 2017 and continued past midnight into the early morning hours of the next day. There was no prejudice to defendant, who did not proffer an alibi defense (see People v Lane, 47 AD3d 1125, 1127 [2008], lv denied 10 NY3d 866 [2008]; People v Alexander, 37 AD3d 908, 909 [2007], lv denied 9 NY3d 839 [2007]; People v Davis, 21 AD3d 590, 592 [2005]).
We reject defendant's assertion that he was denied a fair trial by the improper admission of evidence of an uncharged crime — specifically, that the owner of the second motel saw him driving while intoxicated. "As a general rule, evidence of uncharged crimes or prior bad acts may be admitted where they fall within the recognized Molineux exceptions — motive, intent, absence of mistake, common plan or scheme and identity — or where such proof is inextricably interwoven with the charged crimes, provides necessary background or completes a witness's narrative" (People v Ramsaran, 154 AD3d 1051, 1054 [2017] [internal quotation marks and citations omitted], lv denied 30 NY3d 1063 [2017]). "[A] court may admit such evidence only after making the discretionary determination that the probative value of the evidence outweighs the potential for prejudice to the defendant" (People v Leonard, 29 NY3d 1, 7 [2017]).
Here, contrary to defendant's claim, the owner did not testify that defendant was intoxicated or offer an opinion on that subject. Instead, he testified that, on the evening of the second incident, a car entered the parking lot, dropped defendant off and left. The owner saw defendant "stumbl[e]" as he walked toward his parked car; he then got into his car, drove it through the parking lot, and struck a fence post as he parked it near his room. On the first day of trial and, again, just before the owner gave this testimony, defense counsel objected to its admission on the grounds that evidence that defendant had driven while intoxicated was unfairly prejudicial and that the People had failed to include it in a pretrial Molineux proffer. County Court allowed the testimony, finding that the evidence was part of the res gestae, was intertwined with the facts of the case and was probative of the People's theory that defendant was intoxicated during the second attack on the victim.
The fact that the People did not request pretrial review of this evidence does not affect its admissibility, as the testimony was not given until after "the issue was discussed and ruled on outside of the presence of the jury" (People v Royster, 107 AD3d 1298, 1301 [2013], lv denied 22 NY3d 958 [2013]; see People v Small, 12 NY3d 732, 733 [2009]). While County Court should have provided an express recital of its discretionary balancing of the testimony's probative value against the potential for prejudice, "viewed in the context of . . . defense counsel's opposition based on its prejudicial effect, the court's proper exercise of its discretion is implicit" (People v Milot, 305 AD2d 729, 731 [2003], lv denied 100 NY2d 585 [2003]). Although a limiting instruction would have been advisable, none was requested (see People v Lindsey, 75 AD3d 906, 908 [2010], lv denied 15 NY3d 922 [2010]). We note that the probative value of the testimony was somewhat limited due to its cumulative nature, as the People presented considerable other testimony establishing that defendant was intoxicated at that time. However, the potential for prejudice was also limited, as the testimony was brief and the People did not highlight the fact that defendant operated his vehicle or argue that this showed any propensity for crime. In view of the overwhelming proof of defendant's guilt, we find that any error in the admission of this testimony was harmless (see id.; People v Echevarria, 53 AD3d 859, 863 [2008], lv denied 11 NY3d 832 [2008]).
County Court did not err in declining defendant's request for new assigned counsel due to a potential conflict of interest, and defendant was not denied the effective assistance of counsel as a result. Defendant was represented at trial by two attorneys from the Public Defender's office. On the first day of trial — a Monday — County Court stated that the Public Defender's office had learned on the previous Friday that a different attorney in that office had previously represented one of the People's witnesses — a motel employee — in an unrelated youthful offender matter. The court assigned counsel to assist the employee in deciding whether to waive the attorney-client privilege for purposes of cross-examination; after consultation with counsel, the employee stated that he would waive the privilege. Defendant objected, and the court deferred its decision to give him time for consideration. On the next day, defendant said that he wanted new representation, stating that he was concerned that the Public Defender's office had not discovered the conflict earlier and describing his unhappiness with his representation for various reasons unrelated to the conflict of interest. County Court discussed defendant's concerns with him at some length and ultimately declined to assign new counsel, finding that defendant had been unable to articulate any potential conflict.
It is defendant's "heavy burden" to show that a potential conflict of interest "affected, or operated on, or [bore] a substantial relation to the conduct of the defense" (People v Sanchez, 21 NY3d 216, 223 [2013] [internal quotation marks and citation omitted]; see People v Longtin, 92 NY2d 640, 644 [1998], cert denied 526 US 1114 [1999]; People v McCann, 126 AD3d 1031, 1035 [2015], lv denied 25 NY3d 1167 [2015]). "Defendant has failed to make that showing, as the witness waived his attorney-client privilege for purposes of cross-examination and, indeed, was vigorously cross-examined" (People v McCann, 126 AD3d at 1035; see People v Harris, 99 NY2d 202, 211 [2002]; People v Robles, 115 AD3d 30, 36-37 [2014], lv denied 22 NY3d 1202 [2014]). Defendant's remaining claims of ineffective assistance of counsel — such as his assertions that his counsel failed to visit him or answer his questions — involve matters outside the record and, thus, would be more appropriately addressed in a motion pursuant to CPL article 440 (see People v Mastro, 174 AD3d 1232, 1233 [2019]; People v Trimm, 129 AD3d 1215, 1216 [2015]).
Defendant failed to preserve the claim that his sentence was imposed in retaliation for his decision to go to trial rather than accepting prior plea offers, as he did not raise it at sentencing (see People v Zi He Wu, 161 AD3d 1396, 1397-1398 [2018], lv denied 32 NY3d 943 [2018]). In any event, the fact that his sentence is substantially longer than those offered to him in plea negotiations, without more, does not establish vindictiveness (see id. at 1398; People v Martinez, 144 AD3d 1326, 1326 [2016], lv denied 28 NY3d 1186 [2017]). Notably, County Court remarked at sentencing that it would not have approved the prior plea offers if it had been privy to the information that was disclosed during the trial. In view of the severity of the victim's injuries and defendant's lengthy criminal history in several other states, we perceive no abuse of discretion or extraordinary circumstances warranting a reduction of the sentence (see People v Pleasant, 149 AD3d 1257, 1261 [2017], lv denied 30 NY3d 1022 [2017]).
We find no merit in defendant's claim that the amount of restitution imposed is excessive and unsupported by the evidence. A court may "order a defendant to make restitution of the fruits of his or her offense or reparation of the out-of-pocket loss caused thereby" (People v Connolly, 27 NY3d 355, 359 [2016] [internal quotation marks and citations omitted]; see Penal Law § 60.27), and restitution may be imposed in an amount greater than the statutory cap of $15,000 when the total sum represents "medical expenses actually incurred by the victim
. . . as a result of the offense committed by the defendant" (Penal Law § 60.27 [5] [b]; see Penal Law § 60.27 [5] [a]). The People submitted bills representing approximately $13,000 for the victim's initial medical care and an additional charge of approximately $7,000 for her subsequent care, obtained when the victim sought treatment for increased pain after an impact in the area of the existing orbital fracture. We reject defendant's contention that he should not be held responsible for these later medical charges because that treatment resulted from another injury. The hearing record reveals that the later treatment would not have been necessary if not for the orbital fracture. The sums "reflected the medical expenses actually incurred by the victim as a result of the assault; as such, they were properly recoverable" (People v Kise, 248 AD2d 818, 819 [1998]; see People v Ortiz, 148 AD3d 1291, 1292-1293 [2017]; People v Pump, 67 AD3d 1041, 1042 [2009], lv denied 13 NY3d 941 [2010]).
Lynch, Mulvey, Aarons and Reynolds Fitzgerald, JJ., concur.
ORDERED that the judgment and the order are affirmed.



Footnotes

Footnote 1: Defense counsel enumerated the elements of each of the charged offenses and argued that none were proven, but did not specifically assert any of the issues that are now raised.

Footnote 2: There was medical testimony that this occurred because the pressure of blowing her nose forced air from the victim's sinuses through an opening created by a fracture in the orbital wall of the victim's left eye and into the area around the eyeball.

Footnote 3: The owner of the first motel testified that he spoke with defendant on the morning after the attack and that defendant then moved out.

Footnote 4: The owner of a nearby bar testified that defendant was at the bar on that evening, and that the owner "kept an eye on [defendant]" because he did not recognize him. The bar owner testified that he thought defendant might already have been drunk when he arrived, that he saw defendant consume two drinks, and that defendant became so intoxicated that the bar owner and the bartender drove defendant and his car back to the motel.