People v Paul (2022 NY Slip Op 00912)





People v Paul


2022 NY Slip Op 00912


Decided on February 10, 2022


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:February 10, 2022

110413
[*1]The People of the State of New York, Respondent,
v
Kemoo H. Paul, Appellant.

Calendar Date:December 15, 2021

Before:Egan Jr., J.P., Clark, Pritzker and Colangelo, JJ.

Dennis J. Lamb, Troy, for appellant.
Kristy L. Sprague, District Attorney, Elizabethtown (Kathryn M. Moryl of counsel), for respondent.



Colangelo, J.
Appeal from a judgment of the County Court of Essex County (Meyer, J.), rendered January 4, 2018, upon a verdict convicting defendant of the crimes of criminal possession of a controlled substance in the third degree and criminal possession of a controlled substance in the fourth degree.
In April 2017, defendant was charged by indictment with the crimes of criminal possession of a controlled substance in the third degree, criminal possession of a weapon in the fourth degree and criminal possession of a controlled substance in the third degree, later reduced to criminal possession of a controlled substance in the fourth degree.[FN1] The charges arose from the execution of a search warrant issued for a residence located in the Town of Ticonderoga, Essex County and the seizure of, among other things, crack cocaine and cash in the bedroom occupied by defendant and Claudia Pina, who was one of several individuals also arrested upon the execution of the warrant. Defendant was not found to have any contraband on his person. At the arraignment, the People filed a CPL 710.30 notice, disclosing statements attributed to defendant that would be introduced at trial. Initially, defendant signed a plea agreement but elected to proceed to trial. The People consented to defendant's motion for a Huntley hearing, and requested, at the commencement of the hearing and without objection, that County Court take judicial notice of the search warrant that it had authorized, which it did. At the conclusion of the Huntley hearing, the court declined to suppress defendant's oral and written statements given at the police station. Prior to the calling of witnesses at the ensuing jury trial, County Court granted defendant's motion in limine to preclude the People from introducing evidence of defendant's prior deliveries of drugs to the residence or prior drug sales.
Following a jury trial, defendant was convicted of criminal possession of a controlled substance in the third and fourth degrees. He was thereafter sentenced to a prison term of eight years, followed by two years of postrelease supervision, on the criminal possession of a controlled substance in the third degree conviction and to a lesser concurrent prison term on the remaining conviction. Defendant appeals.
Defendant contends that the verdict is not supported by legally sufficient evidence and is against the weight of the evidence because the People failed to prove that he knowingly and unlawfully possessed the drugs. Specifically, he contends that two of the People's witnesses, Michelle Hurlburt and Shanna Moran, did not testify to seeing him deliver the drugs to Pina, and there was no forensic evidence connecting him to the containers in which the drugs were found. Initially, at the close of the evidence, defendant moved for a trial order of dismissal based upon the insufficiency of the evidence, citing only that these witnesses did not observe him delivering the drugs to Pina. Thus, defendant's challenge [*2]to the legal sufficiency of the evidence is preserved only to that extent (see People v Walker, 191 AD3d 1154, 1155 [2021], lv denied 37 NY3d 961 [2021]). Nevertheless, defendant's challenge based upon the lack of DNA or fingerprint evidence connecting him to the container in which the drugs were found is subject to a weight of the evidence review (see People v Abreu, 195 AD3d 1152, 1153 [2021], lvs denied 37 AD3d 1144 [2021]).
"When assessing the legal sufficiency of a jury verdict, we view the facts in the light most favorable to the People and examine whether 'there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt'" (People v Lendof-Gonzalez, 36 NY3d 87, 91-92 [2020], quoting People v Danielson, 9 NY3d 342, 349 [2007] [internal quotation marks omitted]; see People v Campbell, 196 AD3d 834, 835 [2021], lvs denied 37 NY3d 1025 [2021]). By contrast, "[i]n a weight of the evidence analysis, we view the evidence in a neutral light and determine whether a different verdict would have been unreasonable; if a different verdict would not have been unreasonable, we weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Ferguson, 193 AD3d 1253, 1254 [2021], lv denied 37 NY3d 964 [2021]; see People v Danielson, 9 NY3d at 348).
As relevant here, Penal Law § 220.16 (1) prohibits the knowing possession of a narcotic drug with intent to sell it. Penal Law § 220.09 (1) prohibits the knowing possession of "one or more preparations, compounds, mixtures or substances containing a narcotic drug . . . of an aggregate weight of one-eighth ounce or more."[FN2] Possession includes actual physical possession or constructive possession. "Where, as here, a defendant is not found in physical possession of the controlled substance, constructive possession can be established upon a showing that he or she 'exercised "dominion and control" over the property by a sufficient level of control over the area in which the contraband is found'" (People v Colon, 177 AD3d 1086, 1987 [2019], quoting People v Manini, 79 NY2d 561, 573 [1992]; see Penal Law § 10.00 [8])). "'Dominion or control is necessarily knowing, and such constructive possession may qualify as knowing possession'" People v Shabazz, 177 AD3d 1170, 1171 [2019], quoting People v Muhammad, 16 NY3d 184, 188 [2011]). "Constructive possession may be established by circumstantial evidence and any conflict in the evidence regarding a defendant's dominion and control over the drugs in question . . . creates issues of witness credibility, and the jury's determination in that regard must be accorded great deference" (People v Patterson, 199 AD3d 1072, 1074-1075 [2021] [internal quotation marks and citations omitted]; see People v Shabazz, 177 [*3]AD3d at 1171; People v Palin, 158 AD3d 936, 938 [2018], lv denied 31 NY3d 1016 [2018]). "With respect to establishing a defendant's intent to sell drugs, the jury is allowed to infer, based on the amount of drugs at issue, that the defendant possessed them for the purpose of financial gain, rather than personal consumption" (People v Patterson, 199 AD3d at 1075 [internal quotation marks and citation omitted]).
Moran testified that she owns the residence at issue and met defendant there eight months prior to trial. Moran further testified that, during February and March 2017, defendant came to the residence once or twice a week and stayed in the upstairs right bedroom with Pina, who oversaw the sales of the drugs. Moran identified the car driven by defendant to and from the residence as a green Toyota Camry with Massachusetts license plates. Moran testified that, on March 17, 2017, the day before the search warrant was executed, she saw the scale and baggies in the upstairs right bedroom, and that defendant arrived at the residence with the drugs and brought them upstairs. She knew that defendant brought the drugs because there was no crack cocaine in the residence before he arrived, and there were at least 100 grams in the residence after his arrival. Moran further testified that, on March 17, 2017, she saw the drugs out on the table being broken up by Pina, to be sold in half-gram or gram bags, and saw defendant in the bedroom with Pina as she prepared the drugs for sale. On March 18, 2017, Moran sold drugs. She went into the upstairs right bedroom and Pina gave her $400 worth of crack cocaine to sell. After the sale, Moran brought the money back to Pina and was given the same amount of crack cocaine to sell. She testified that defendant stayed in the upstairs right bedroom with Pina as the sales were made throughout the day. Moran estimated that, on March 18, 2017, approximately 20 buyers came to the residence to buy drugs. She further testified that defendant would bring the drugs to the residence when he would come to the residence once or twice a week during the eight-month period.
Hurlburt, who was also present at the residence when the search warrant was executed, testified that defendant was the "runner" — the one who would bring the drugs to the residence. Defendant came to the residence every three to four days or whenever they ran out of drugs. No one aside from defendant and Pina stayed in or had access to the upstairs right bedroom. Defendant would usually stay at the house for a night or two in the upstairs right bedroom with Pina. Abby Braunius, a State Police investigator in the narcotics enforcement unit, testified that she surveilled the residence during February and March 2017. She was looking for a green Toyota Camry with a Massachusetts registration, later identified as defendant's car, and saw the car at the residence six or seven times during that two-month period. Braunius testified that the car came and [*4]stayed for approximately a day or two, during which time there was an influx of foot and vehicle traffic. On March 16, 2017, Braunius saw defendant driving the car. According to Braunius, the warrant was executed on March 18, 2017 at 7:45 p.m., and, during that day, between 30 and 60 people went in and out of the residence and would stay for less than five minutes.
Braunius further testified that a special operations response team of the State Police executed the search warrant. They entered and secured the residence and detained the occupants, including defendant. Uniformed members of the State Police then entered the residence, handcuffed the occupants and removed them. Braunius and a state trooper with forensic experience entered the residence, took photographs of, as relevant here, the upstairs right bedroom and evidence recovered therein, which included a white box of sandwich bags and a yellow sandwich bag box containing a scale with white residue from a table. They also seized items from a bed therein, which included $1,994 in cash, a clear bag with crack cocaine tie-offs and rubber bands, a closed raisin container, a pair of scissors, a clear cashew container with $150 in cash and 17 plastic tie-offs, and some personal items. Braunius testified that, from her training and experience, rubber bands are used to bundle the bags of crack cocaine together. She further testified that she removed the top of the raisin container and found therein a large plastic bag containing 131 plastic tie-off bags of what appeared to be crack cocaine. Also seized from this bedroom were 148 small individual bags of crack cocaine with a street value of $14,800, wax envelopes that contained a white substance on a cabinet shelf, a black wallet that contained defendant's driver's license, a cell phone, and a black purse that contained Pina's passport, Social Security card and $8,600 in cash. Kathryn Botting, a forensic scientist with the State Police, testified that the drugs recovered in the upstairs right bedroom weighed 14.7 grams and indicated the presence of cocaine.
Viewed in the light most favorable to the People, the foregoing evidence was legally sufficient to establish that defendant brought the drugs to the residence and that he exercised dominion and control over the upstairs right bedroom so as to establish constructive possession of the contraband and to support his convictions for criminal possession of a controlled substance in the third and fourth degrees (see People v Patterson, 199 AD3d at 1075-1076; People v Shabazz, 177 AD3d at 1172; People v Colon, 177 AD3d at 1088; People v Durfey, 170 AD3d 1331, 1333-1334 [2019], lv denied 34 NY3d 980 [2019]). Although a different verdict would not have been unreasonable, viewing the evidence in a neutral light and deferring to the jury's credibility determinations, we further find that the convictions are not against the weight of the evidence (see People v Rudge, 185 AD3d 1214, 1216-1217 [2020[*5]], lv denied 35 NY3d 1070 [2020]; People v Kalabakas, 183 AD3d 1133, 1140 [2020], lv denied 35 NY3d 1067; People v Colon, 177 AD3d at 1088).
Defendant next contends that County Court erred in denying suppression of his statements because the People failed to prove that the police had probable cause to arrest him, and the subsequent statements were the product of the earlier unlawful statement. Prior to the examination of witnesses at the Huntley hearing, the People requested, and defense counsel did not object, to the court taking judicial notice of the search warrant. Further, in his stipulation in lieu of a pretrial omnibus motion, defendant did not seek a Dunaway hearing, nor did he raise a challenge to the legality of the arrest in the suppression motion that he filed with respect to his statements. As such, defendant's challenge to the legality of his arrest is unpreserved for our review (see People v Jones, 8 AD3d 897, 898 [2004], lv denied 3 NY3d 708 [2004]; People v Purcelle, 282 AD2d 824, 824-825 [2001]).
On a motion to suppress, "the People bear the burden of proving beyond a reasonable doubt that the defendant's statement[s] to police [were] voluntarily given, including that any custodial interrogation was preceded by the administration and the defendant's knowing waiver of his or her Miranda rights" (People v Teixeira-Ingram, 199 AD3d 1240, 1241 [2021] [internal quotation marks and citations omitted]). "If the People meet their burden, then the defendant bears the burden of persuasion" (People v Smith, 193 AD3d 1260, 1264 [2021], lv denied 37 NY3d 968 [2021]). "Determining whether a statement is voluntary is a factual issue governed by the totality of the circumstances and the credibility assessments of the suppression court in making that determination are entitled to deference" (People v Davis, 196 AD3d 918, 919-920 [2021] [internal quotation marks and citations omitted]; see People v Rudolph, 170 AD3d 1258, 1259 [2019], lv denied 34 NY3d 937 [2019]).
"Where a defendant is read his or her rights from a preprinted card prior to any questioning, a 'defendant's unambiguous acknowledgment that he [or she] understood his [or her] rights and subsequent participation in answering . . . questions constitute[s] an implicit waiver of his [or her] Miranda rights'" (People v Durfey, 170 AD3d at 1334, quoting People v Green, 141 AD3d 1036, 1038 [2016], lv denied 28 NY3d 1072 [2016]). However, "where an improper, unwarned statement gives rise to a subsequent Mirandized statement as part of a 'single continuous chain of events,' there is inadequate assurance that the Miranda warnings were effective in protecting a defendant's rights, and the warned statement must also be suppressed" (People v Paulman, 5 NY3d 122, 130 [2005], quoting People v Chapple, 38 NY2d 112, 114 [1975]). "To determine whether those [subsequently administered] Miranda warnings were effective in protecting [the] defendant's rights or whether the subsequent [oral and[*6]] written statement[s] [were] part of a 'single continuous chain of events' requiring [their] suppression, courts look to numerous factors, 'including the time differential between the Miranda violation and the subsequent admission[s]; whether the same police personnel were present and involved in eliciting each statement; whether there was a change in the location or nature of the interrogation; the circumstances surrounding the Miranda violation, such as the extent of the improper questioning; and whether, prior to the Miranda violation, [the] defendant had indicated a willingness to speak to police'" (People v Harris, 141 AD3d 1024, 1028-1029 [2016], quoting People v Paulman, 5 NY3d at 130-131).
County Court deemed all of the hearing witnesses credible, and we defer to that finding (see People v Davis, 196 AD3d at 921). The record of the suppression hearing establishes that, after defendant was placed under arrest inside the residence, he was escorted outside to where Braunius was located. Braunius asked defendant his name, date of birth and where he had been located in the residence. Defendant admitted that he was in the upstairs front bedroom. He was then transported to the State Police barracks, brought inside and handcuffed to a bench. The record further establishes that, at approximately 1:05 a.m., Michael Madore, an investigator with the State Police, brought defendant into the sergeant's room of the station, read defendant his Miranda warnings out loud, asked defendant if he understood those rights and defendant said "yes." Madore then asked defendant if, understanding those rights, he wished to speak to him, and defendant replied affirmatively. Defendant then answered Madore's questions and admitted, among other things, that he was staying in the upstairs right bedroom. After defendant indicated that he was willing to give a written statement, Dustin Fleishman, a state trooper, advised defendant again of his Miranda rights and then asked defendant if he understood those rights, to which defendant answered "yes." Fleishman then asked defendant if, having these rights in mind, he wished to speak to him, and defendant answered "yes." Fleishman asked defendant questions and typed defendant's answers onto a computer. Fleishman printed the statement and showed it to defendant and, after ascertaining that defendant could read and write, Fleishman observed defendant read the statement. Before defendant signed the statement, Fleishman explained the Penal Law notice regarding false statements at the bottom of the statement, which defendant read, initialed and signed.
The record further establishes that defendant was provided with a written recitation of the same rights read to him by both troopers when he made the written statement to Fleishman, and defendant initialed each of the rights on the form and signed the statement that read: "I fully understand these rights, and at this time I agree to give up my rights and make the following [*7]statement." Both Fleishman and Madore testified that they never threatened defendant, and County Court found that there was no evidence showing that defendant was coerced, misled or otherwise tricked into making the statements. According due deference to the determination of the suppression court that the delay of almost six hours between defendant's arrest and his interrogation by Madore and Fleishman does not require suppression of his warned statements, and given the totality of the circumstances, we find that defendant's motion to suppress his statements was properly denied (see People v Logan, 198 AD3d 1181, 1184 [2021]; People v Butcher, 192 AD3d 1196, 1197-1198, lv denied 36 NY3d 1118 [2021]).
We also reject defendant's contention that County Court committed reversible error in allowing the People to introduce evidence about his prior drug-related uncharged crimes and bad acts and thereafter refusing to grant his motion for a mistrial.
"As a general rule, evidence of uncharged crimes or prior bad acts may be admitted where they fall within the recognized Molineux exceptions — motive, intent, absence of mistake, common plan or scheme and identity — or where such proof is inextricably interwoven with the charged crimes, provides necessary background or completes a witness's narrative" (People v Baber, 182 AD3d 794, 900 [2020] [internal quotation marks and citations omitted], lv denied 35 NY3d 1064 [2020]; see People v Leonard, 29 NY3d 1, 7 [2017]; People v Lindsey, 172 AD3d 1764, 1766 [2019]). "[A] court may admit such evidence only after making the discretionary determination that the probative value of the evidence outweighs the potential for prejudice to the defendant" (People v Leonard, 29 NY3d at 7).
During the direct examination of Moran, the People inquired about where and how she met defendant. Moran stated that "[defendant] brought drugs back and forth to my house." County Court sustained defense counsel's immediate objection on the basis that the answer was not responsive to the question and directed the jury to disregard the question and answer, as if they were never said. Moran thereafter testified to the frequency of defendant's prior visits and stays at the residence. Defense counsel unsuccessfully moved for a mistrial. County Court found Moran's answer about defendant bringing drugs to be "limited" and "inadvertent" and offered to give a limiting instruction, which was declined. During cross-examination, defense counsel elicited testimony that, on March 18, 2017, Moran sold drugs and that she first met Pina in 2016 with another male at her house. Defense counsel was then warned that, by pointing the finger at Pina and the other male as being the operators of the drug sales from Moran's house, he was opening the door to the People's entitlement to explore Moran's relationship with defendant prior to March 18, 2017, including his prior deliveries of drugs. Defense counsel continued to cross-examine Moran about Pina's [*8]involvement in the drug sales. To correct the likely misimpression left with the jury that Pina was the only party involved in drug sales from the residence, County Court ruled that defense counsel had opened the door to some evidence by the People that defendant and Pina were working together prior to March 2017. We agree with the court's determination that defendant's prior uncharged criminal conduct was inextricably interwoven with the charged crimes and particularly relevant and material to issues of intent to sell and identity (see People v Baber, 182 AD3d at 800-801), after having determined that the probative value of such evidence outweighed the potential for prejudice to defendant (see People v Leonard, 29 NY3d at 7). We further find that the court attenuated any prejudice to defendant by instructing the jury, during Moran's redirect testimony and again prior to deliberation, as to the proper purpose for which the challenged evidence may be considered (see People v Lindsey, 172 AD3d at 1766).
We are unpersuaded by defendant's contention that he is entitled to a new trial because the charge given to the jury under the caption "[e]videntiary [i]nferences" was unnecessary, confusing and misleading. On the third day of trial, after counsel had received copies of the draft final jury charges, defense counsel requested to remove the evidentiary inferences charge as duplicative of the charge on circumstantial evidence. The People opposed and the jury was charged in accordance with the draft final jury charge. We find that the evidentiary inferences charge was proper and assisted the jury in understanding how to evaluate the trial evidence (see People v Valentin, 29 NY3d 57, 62 [2017]).
Finally, "[d]efendant failed to preserve his claim that his sentence was imposed in retaliation for his decision to go to trial rather than accepting a plea offer, as he did not raise it at sentencing" (People v Baber, 182 AD3d at 802-803; see People v Santana, 179 AD3d 1299, 1303 [2020], lv denied 35 NY3d 973 [2020]). "In any event, the fact that his sentence is substantially longer than [that] offered to him in plea negotiations, without more, does not establish vindictiveness" (People v Baber, 182 AD3d at 803). As to the severity of his sentence, "[i]t is well settled that a sentence that falls within the permissible statutory ranges will not be disturbed unless it can be shown that the sentencing court abused its discretion or that extraordinary circumstances exist warranting a modification in the interest of justice" (People v Walker, 191 AD3d at 1160 [internal quotation marks and citations omitted]). Neither circumstance is present here.
Egan Jr., J.P., Clark and Pritzker, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: Prior to trial, the third count of the indictment was amended to reduce the weight of the cocaine from 75 grams to 14.7 grams.

Footnote 2: It is undisputed that cocaine is a type of narcotic drug (see Penal Law § 220.00 [7]).