People v Newhall (2022 NY Slip Op 03765)

People v Newhall

2022 NY Slip Op 03765

Decided on June 9, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 9, 2022

110617 112620
[*1]The People of the State of New York, Respondent,
v
Vernon Newhall, Appellant.

Calendar Date:April 18, 2022

Before:Egan Jr., J.P., Colangelo, Ceresia and Fisher, JJ.

Paul J. Connolly, Delmar, for appellant.
Meagan K. Galligan, District Attorney, Monticello (Lisa M. Bondarenka of counsel), for respondent.

Egan Jr., J.P.
Appeals (1) from a judgment of the County Court of Sullivan County (McGuire, J.), rendered October 6, 2017, upon a verdict convicting defendant of the crimes of rape in the second degree (two counts), criminal sexual act in the third degree, rape in the third degree and endangering the welfare of a child, and (2) by permission, from an order of said court (Rounds, J.), entered November 6, 2020, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment of conviction, without a hearing.
In February 2017, defendant (born in 1966) was charged in a seven-count indictment with offenses stemming from his sexual relationship with the underage victim (born in 1999) between 2014 and 2016. Following a jury trial, defendant was convicted of rape in the second degree (two counts) relating to incidents of sexual intercourse at some point in November 2014 and on December 7, 2014, criminal sexual act in the third degree relating to an incident of oral sexual conduct late in December 2014, rape in the third degree relating to a September 2016 incident of sexual intercourse, and endangering the welfare of a child relating to the pattern of defendant's conduct toward the victim between November 2014 and September 2016. County Court (McGuire, J.) thereafter sentenced defendant to terms of seven years in prison to be followed by 10 years of postrelease supervision on each rape in the second degree conviction and a term of four years in prison to be followed by 10 years of postrelease supervision on the criminal sexual act in the third degree conviction, those terms to run consecutively, and a concurrent sentence of four years in prison and 10 years of postrelease supervision on the rape in the third degree conviction. County Court further sentenced defendant to a jail term of one year upon his endangering the welfare of a child conviction that merged by operation of law with the other sentences (see Penal Law § 70.35). Defendant appeals from the judgment and, by permission, from the order denying his subsequent CPL 440.10 motion.
We affirm. Contrary to defendant's initial contention, his challenge to the legal sufficiency of the evidence supporting the verdict was not preserved for our review by his generalized motion to dismiss at trial (see People v Jones, 202 AD3d 1285, 1286 [2022]; People v Baber, 182 AD3d 794, 795 [2020], lv denied 35 NY3d 1064 [2020]). Defendant's further argument that the verdict was against the weight of the evidence will nevertheless require this Court to assess whether each element of the crimes for which defendant was convicted was proven beyond a reasonable doubt (see People v Danielson, 9 NY3d 342, 349 [2007]; People v Jones, 202 AD3d at 1286). In conducting that analysis, we first consider whether a different verdict "would not have been unreasonable" and, if such is the case, go on to "weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength [*2]of such conclusions" to determine "whether the jury was justified in finding the defendant guilty beyond a reasonable doubt" (People v Danielson, 9 NY3d at 348; see People v Horton, 181 AD3d 986, 988 [2020], lv denied 35 NY3d 1045 [2020]).
In that regard, the victim testified to 2014 incidents in which she engaged with the adult defendant in sexual intercourse twice at the age of 14, and in oral sexual conduct shortly after she turned 15 (see Penal Law §§ 130.30 [1]; 130.40 [2]). The victim described how defendant, a man with whom she had resided and whom she viewed as a father figure, had taken her to Georgia to press charges against a man who had sexually assaulted her and personally handled her allegations that family members had sexually molested her. The victim testified that her relationship with defendant itself turned sexual after he provided that assistance, and that they first had sexual intercourse upon their return from Georgia in November 2014. They again had sex in her bedroom on December 7, 2014, a date the victim recalled because seven was her lucky number and she had found a piece of chocolate in her Advent calendar that day. The victim also described an incident toward the end of December 2014, which she remembered specifically because it occurred just before the new year and just after her 15th birthday, in which defendant directed her to join him in the bathroom to retrieve a pair of her earrings and, in view of the victim's mother, inserted his penis into her mouth as she bent over to do so.
The victim testified as to how her sexual encounters with defendant continued from 2014 until 2016 and how defendant would hit her if she refused to have sex with him. She offered few details of the encounters during that period, and stated that they largely ceased after she told defendant in July 2016 that she did not want to continue the sexual relationship. The victim did, however, testify to a single subsequent incident of sexual intercourse that occurred in September 2016, when she was 16 years old (see Penal Law § 130.25 [2]).[FN1] In particular, the victim described how defendant came to her bedroom demanding sex and that, although she initially turned him down, she acceded out of fear after he promised that he was "going to get what [he] want[ed]" and was "going to take it."
Soon after the September 2016 incident, the victim disclosed the sexual relationship to her therapist and a school nurse she trusted, which led to her speaking to a State Police investigator. In an effort to collect further proof of defendant's guilt, the investigator gave the victim a pen camera to record a conversation with defendant about their relationship. The recording of the resulting conversation between defendant and the victim was entered into evidence at trial, and it depicts, among other things, defendant repeatedly asking if the victim was recording him. Defendant proceeds to tell the victim that she "need[ed] somebody [her] own age," pleads [*3]with her not to "give [him] up" and warns her that child abuse investigators were trying to "trip [her] up." The victim goes on to tell defendant that she felt "really bad" that she had "end[ed] it" by telling him that she did not "want to do it anymore," prompting defendant to tell her that he understood, that he knew it was getting "awkward" and that he "want[ed] to be her dad."
In response, defendant presented proof that included testimony from him, the victim's mother and a foster mother to both defendant and the victim's mother who frequently saw the victim. Defendant denied engaging in the charged behavior with the victim and claimed that his comments during the recorded conversation related to his concerns about the victim's relationship with another adult male and a child protective services investigation into a confrontation over the state of her bedroom in which he struck her in the face. Defendant further noted that he denied the victim's accusations when questioned by the State Police investigator, and he testified that his angry demeanor during that recorded interview was due to his indignation at having been falsely accused. The victim's mother testified that she knew nothing about an inappropriate relationship between defendant and the victim and that the December 2014 incident in which she allegedly witnessed the victim engaged in oral sexual conduct with defendant was an innocent one that did not include any sexual behavior. Testimony was further presented as to how the victim's behavior had deteriorated from 2014 onward, the suggestion being that the victim falsely accused defendant of sexual misconduct in order to escape his efforts to discipline her. It was also undisputed that the victim had recanted her allegations against defendant while she was living at a treatment facility in the wake of his arrest.
Assuming, without deciding, that the foregoing evidence rendered defendant's acquittal a reasonable possibility despite his damning statements in the recorded conversation between him and the victim, other proof called it into serious question. For example, although defendant claimed that an ongoing investigation into his hitting the victim was what prompted many of the comments he made during their recorded conversation, he admitted receiving a letter prior to that conversation in which he was advised that the investigation had been closed. The victim further explained in her trial testimony that the allegations against defendant were true and that she only recanted because her mother, who was pressuring her to drop the charges against defendant and filed the Family Ct Act article 7 petition that resulted in her placement in a treatment facility after his arrest, promised to secure her release if she did so. The mother did not deny that she had asked the victim to recant in her testimony, instead invoking her Fifth Amendment right against self-incrimination when cross-examined on that point. The jury heard all of [*4]this proof and, notwithstanding the lack of physical evidence and the presence of some inconsistencies in the victim's account, found her account more credible than the one offered by defendant. We accord deference to that assessment and, having weighed the conflicting evidence and viewing the proof in a neutral light, are satisfied that the verdict is supported by the weight of the evidence in all respects (see People v Wright, 155 AD3d 1452, 1454-1455 [2017], lv denied 30 NY3d 1121 [2018]; People v Chirse, 146 AD3d 1031, 1032-1033 [2017], lv denied 29 NY3d 947 [2017]; People v Knapp, 138 AD3d 1157, 1157-1158 [2016]).
As for defendant's other challenges to the conduct of the trial, he argues that County Court erred in preventing his testimony on certain points. First, County Court sustained objections to defendant's testimony that he was on trial for a "[f]alse accusation of sexual assault," as well as trial counsel's follow-up question as to whether he was "innocent or guilty of these charges," upon the ground that the question of his guilt was "a determination for the jury to make" and was not an appropriate subject for testimony. As County Court noted, it is the jury that "draw[s] the ultimate conclusion of guilt or innocence" (United States v Gaudin, 515 US 506, 514 [1995]; see People v Dioguardi, 8 NY2d 260, 274 [1960]).[FN2] It is nevertheless apparent that, regardless of the wording used, the objected-to testimony and question were not designed to usurp that function and were instead meant to alert the jury to defendant's factual claim that the charged crimes had not occurred. The attempt to present testimony "which would establish [defendant's] innocence," if believed, was proper and did not impinge upon the jury's authority to "return[] a guilty verdict based upon the competing facts and inferences of the People's case" (People v Lucas, 105 AD2d 545, 548 [1984], cert denied 474 US 911 [1985]; see People v Widdi, 148 AD2d 648, 648 [1989], lv denied 76 NY2d 670 [1989]). It follows that the failure to allow that testimony was error.
That said, the trial transcript reflects that defendant repeatedly asserted his innocence in the absence of that testimony. He denied that he had ever had sexual intercourse with the victim "from [his] date of birth until today." When later asked if he had been accused of any conduct that had never occurred during his interview with the State Police investigator, defendant reiterated that he had never engaged in sexual intercourse with the victim and that the thought "turn[ed] [his] stomach." He also specifically denied that much of the charged conduct had occurred, stating that he did not have sex with the victim on December 7, 2014 and that the bathroom encounter with the victim later that month was an innocuous one in which he wore pants and underpants in the "proper area" at all times. Defendant also stated that, contrary to the victim's accusation, nothing unusual occurred between them in September [*5]2016. The erroneously precluded testimony was cumulative to that heard by the jury, in other words, and the error was harmless as a result (see People v Bottomley, 146 AD3d 1026, 1028 [2017], lv denied 29 NY3d 947 [2017]; People v Felton, 133 AD2d 232, 232 [1987], lv denied 70 NY2d 874 [1987]; People v Rivera, 101 AD2d 981, 982 [1984], affd for reasons stated below 65 NY2d 661 [1985]).
Defendant also argues that County Court erred in declining to allow him to testify that he had never cut off the victim's pants with a box cutter before having sex with her. He only sought to give that testimony, however, because the State Police investigator asked him in the course of their recorded interview whether that incident had occurred. Defendant responded that it had not — which was unsurprising since he consistently maintained that he had never had sex with the victim to begin with — and no attempt was made to prove otherwise at trial. The question of whether the incident occurred was therefore irrelevant in that it did not "tend[] to prove the existence or non-existence of a material fact, i.e., a fact directly at issue in the case," and County Court properly refused to allow testimony from defendant on that point (People v Primo, 96 NY2d 351, 355 [2001]; see People v Johnson, 47 NY2d 785, 786-787 [1979], cert denied 444 US 857 [1979]; People v Hansel, 200 AD3d 1327, 1331 [2021], lv denied 38 NY3d 927 [2022]).
Defendant next argues that County Court erred in responding to a note from the jury that expressed confusion as to whether it needed to be "a hundred percent convinced of guilt . . . to reach a verdict" and requested that reasonable doubt be defined "in a different way." County Court told the jury in response to this note that, "whatever that magic number" at which proof beyond a reasonable doubt exists, "it[] [is] more than 51 [percent] and less than a hundred" percent certainty of defendant's guilt. County Court first advised the jury, however, that the People did not need to "prove a defendant guilty beyond all possible doubt, or your words, a hundred percent," but that "significantly more than probably guilty, 51 percent," was required. County Court then defined reasonable doubt using language tracking its initial, proper charge — including that reasonable doubt was "an honest doubt for which some reason exists," "an actual doubt, not an imaginary doubt," and one that "reasonable people . . . acting in a manner that[] [is] very important . . . would be likely to entertain because of the evidence that was presented or because of the lack of evidence that was presented" — before making its "magic number" comment and immediately adding that the People's burden would not be met unless the jury was "so firmly convinced of the defendant's guilt that [it had] no honest reasonable doubt."
The better course would have been for County Court to "repeat rather than expound upon [its] original proper instruction" (People v Malloy, 55 NY2d 296, [*6]303 [1982], cert denied 459 US 847 [1982]; see People v Leonard, 177 AD3d 1158, 1162 [2019], lv denied 34 NY3d 1160 [2020]; People v Redd, 266 AD2d 12, 12 [1999], lv denied 94 NY2d 866 [1999]), but trial counsel failed to object to County Court's supplemental instruction and, in fact, confirmed that he found it "[a]greeable." Defendant's challenge to the supplemental instruction is accordingly unpreserved for our review (see People v Abussalam, 196 AD3d 1000, 1009 [2021], lv denied 37 NY3d 1144 [2021]; People v House, 132 AD2d 807, 808 [1987]), and we are unpersuaded that corrective action is required in the interest of justice (see e.g. People v Brown, 2 AD3d 1216, 1218 [2003], lvs denied 3 NY3d 637 [2004]; People v Williams, 277 AD2d 945, 945 [2000], lv denied 96 NY2d 789 [2001]).
The bulk of defendant's remaining arguments on his direct appeal are unpreserved for our review, but he argues that trial counsel afforded ineffective assistance by both failing to preserve those issues and in a myriad of other respects. His efforts are entirely unpersuasive. For example, defendant faults trial counsel for failing to object to proof regarding uncharged sexual encounters between defendant and the victim and his threats of force toward her between 2014 and 2016. The evidence was admissible to prove the endangering the welfare of a child count against defendant relating to that period (see People v Fuller, 50 AD3d 1171, 1176 [2008], lv denied 11 NY3d 788 [2008]), however, and "counsel cannot be deemed ineffective for failing to raise an objection that had little or no chance of succeeding" (People v Perez, 183 AD3d 934, 937 [2020], affd 36 NY3d 1093 [2021]; see People v Caban, 5 NY3d 143, 152 [2005]).[FN3] Defendant further complains that trial counsel should have more vigorously objected to cross-examination of the victim's mother regarding the concerns of the victim's half sister about the time defendant and the victim spent together alone but, even accepting that the questioning was improper, that "error alone is insufficient to constitute ineffective assistance" (People v Wells, 101 AD3d 1250, 1255 [2012], lv denied 20 NY3d 1066 [2013]). Similarly, assuming, without deciding, that defendant's general reputation for honesty in the community was relevant (but see People v Catalan, 204 AD3d 1240, 1244 [2022]; People v Fanning, 209 AD2d 978, 979 [1994], lv denied 85 NY2d 908 [1995]), the value of an opinion on that point would have been "slight" in view of the compelling proof of defendant's guilt, and any error in failing to obtain it from his foster mother did not rise to the level of ineffective assistance (People v Miller, 35 NY2d 65, 69 [1974]; accord People v Aharonowicz, 71 NY2d 678, 682 [1988]).
In contrast to the dark portrait of trial counsel painted by defendant from the foregoing, our review of the record as a whole reveals a capable performance in which counsel engaged in appropriate pretrial motion practice, fashioned a cogent defense [*7]strategy of portraying the victim as a troubled and manipulative girl who had fabricated the accusations against defendant, and then capably executed that strategy at trial. Those efforts bore fruit despite defendant's conviction on some of the charges against him, as counsel successfully moved for dismissal of one of the counts against defendant and obtained his acquittal on another. As such, viewing the evidence, the law, and the circumstances of this case in totality and at the time of the representation, we are satisfied that the record shows defendant to have received meaningful representation (see People v Baldi, 54 NY2d 137, 147 [1981]; People v Lafountain, 200 AD3d 1211, 1216-1217 [2021], lv denied 38 NY3d 951 [2022]; People v Wiltshire, 96 AD3d 1227, 1230 [2012], lv denied 22 NY3d 1204 [2014]).
In view of the serious and exploitative nature of defendant's conduct, we do not perceive his sentence to be unduly harsh or severe (see People v Warrington, 155 AD3d 1450, 1452 [2017]; People v Kamp, 129 AD3d 1339, 1341 [2015], lv denied 26 NY3d 969 [2015]). Defendant's remaining arguments on his direct appeal have been examined and are lacking in merit.
Turning finally to the appeal from the order denying defendant's CPL article 440 motion, he focuses upon the arguments that evidence outside of the record shows trial counsel to have rendered ineffective assistance by failing to prepare defendant and the victim's mother for their trial testimony. Trial counsel notably declined to provide an affirmation on those or any other points in support of that motion, stating that he was unable to provide any information that would be favorable to defendant. Defendant's claims regarding the failure of trial counsel to prepare him for his testimony were therefore supported only by his own self-serving affidavit and, in view of a trial record showing a well-informed trial counsel examining him in detail about his account of events and his recorded statements to the victim and the State Police investigator, there is no reasonable possibility that those claims were true (see 440.30 [4] [d]; People v Hanley, 249 AD2d 680, 681-682 [1998], lv denied 92 NY2d 898 [1998]). As for trial counsel's failure to prepare the victim's mother for her testimony, she acknowledged in her affidavit that such was a deliberate decision designed to enhance her credibility with the jury when she gave testimony favorable to defendant and, indeed, trial counsel elicited that they had never met or discussed the case at the outset of her testimony. Although defendant speculates that such was a mistake because preparation might have prevented the victim's mother from being impeached with her prior inconsistent statements and invoking her right against self-incrimination during cross-examination, "[i]t is not for this [C]ourt to second-guess whether a course chosen by defendant's counsel was the best trial strategy, or even a good one, so long as defendant was afforded meaningful [*8]representation" (People v Satterfield, 66 NY2d 796, 799-800 [1985]; see People v Manchester, 123 AD3d 1285, 1289 [2014], lv denied 26 NY3d 931 [2015]; People v Vann, 216 AD2d 599, 602 [1995], lv denied 86 NY2d 875 [1995]). The record reflects that defendant did receive meaningful representation and, as nothing in his CPL article 440 motion papers substantiated facts outside the record suggesting otherwise, County Court (Rounds, J.) properly denied that motion without a hearing (see CPL 440.30 [4] [b]).
Colangelo, Ceresia and Fisher, JJ., concur.
ORDERED that the judgment and order are affirmed.

Footnotes

Footnote 1: Defendant points out that the victim testified that their sexual relationship ended in July 2016 but that they had a later sexual encounter in September 2016. To the dubious extent that such is a true discrepancy given the victim's testimony that the sexual relationship did end in July 2016 and that she only acceded to defendant's later demand for sex to avoid being assaulted, we do not agree with defendant that either it or any other inconsistency in the victim's account rendered her testimony incredible as a matter of law (see People v Fernandez, 106 AD3d 1281, 1283-1284 [2013]; People v Edkin, 210 AD2d 808, 809-810 [1994], lv denied 85 NY2d 937 [1995]).

Footnote 2: To the extent that defendant's related complaint about the comments made by County Court in the wake of sustaining those objections is preserved, those comments did not suggest the court's belief that the likely outcome of the trial was a guilty verdict. County Court instead stressed that defendant was presumed innocent and that it was the jury's task to determine whether the burden of proof had been met and, in its closing instructions, the court fully explained those points and made clear that "nothing that [it had] said . . . in the course of this trial [was] meant to suggest that [it had] an opinion about this case" (see People v Robinson, 100 AD3d 934, 935 [2012], lv denied 20 NY3d 1103 [2013]).

Footnote 3: Defendant also suggests that trial counsel should have objected to the admission of evidence regarding his attacking family members who had allegedly abused the victim, but there were obvious strategic reasons to allow the jury to hear that proof since it portrayed defendant as highly protective of the victim and not someone, presumably, who would have sexually abused her as alleged.