People v Hilts (2020 NY Slip Op 06173)





People v Hilts


2020 NY Slip Op 06173


Decided on October 29, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: October 29, 2020

109850

[*1]The People of the State of New York, Respondent,
v
Jeffrey Hilts, Also Known as Jahiem, Appellant.

Calendar Date: September 10, 2020

Before: Garry, P.J., Lynch, Clark, Aarons and Reynolds Fitzgerald, JJ.


Mitchell S. Kessler, Cohoes, for appellant.
Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.



Garry, P.J.
Appeal from a judgment of the County Court of Schenectady County (Sypniewski, J.), rendered September 13, 2017, upon a verdict convicting defendant of the crimes of criminal possession of a weapon in the second degree and criminal sale of a firearm in the third degree.
In April 2015, a confidential informant (hereinafter CI) working with the Federal Bureau of Investigation (hereinafter FBI) arranged to purchase a firearm from an individual known to him as "Jaheim" and later identified as defendant.[FN1] When the CI arrived at defendant's residence the following day to complete the sale as arranged, he was told that defendant was not present. An individual later identified as codefendant Kenny Walters completed the sale. Defendant and Walters were charged in separate indictments with criminal possession of a weapon in the second degree (two counts), criminal sale of a firearm in the third degree and criminal possession of stolen property in the fourth degree. Their indictments were joined for trial.
Before trial, the People made a Molineux application for permission to introduce evidence of defendant's and Walters' gang affiliations to explain the relationships among the participants to the sale. The People stated that they did not intend to introduce evidence connecting either man to criminal conduct that could be associated with gang activities, such as the sale of narcotics. Over the objections of defendant and Walters, County Court granted the application. During the ensuing joint jury trial, defendant and Walters each unsuccessfully moved for a mistrial when a witness testified that individuals were thought to be "cutting narcotics in the back" of defendant's residence while the subject gun transaction was taking place. Defendant and Walters were each convicted of one count of criminal possession of a weapon in the second degree and criminal sale of a firearm in the third degree. Defendant was sentenced as a second felony offender to a prison term of 15 years on the criminal possession conviction and a lesser concurrent term on the sale conviction, each term to be followed by five years of postrelease supervision. Defendant appeals.
Defendant first contends that the verdict is against the weight of the evidence, arguing that — in view of his absence at the time of the sale and the alleged unreliability of the CI's testimony — the People did not prove his involvement beyond a reasonable doubt. At trial, a special agent with the FBI testified that he was a member of a task force that partnered with local police departments to target gang activity. He testified that the CI initially approached the Schenectady County District Attorney's office with information related to an ongoing FBI investigation, and thereafter worked with the FBI agent for about a year on several cases, including the instant prosecution. According to the FBI agent, the CI's stated motivation for sharing information was revenge against certain individuals; in later testimony, the CI confirmed this basis, stating the grounds for his anger and wish for vengeance. The FBI agent also described the benefits provided to the CI, including the cost of housing, food, clothing, assistance with certain fines, and a weekly stipend. The CI also received a sentence of time served on a criminal contempt charge. The FBI agent testified that these benefits were provided without regard to the outcome of the CI's cases. He acknowledged that the CI had not always followed FBI protocol in other cases, but further stated that the CI had complied with protocols in the current case and others and had assisted in several successful prosecutions.
The FBI agent testified regarding the CI's gang affiliations and the history of his involvement in this case. The CI was working as an "enforcer" for the Bloods gang, a position in which he, among other things, guarded locations where the Bloods conducted narcotics and firearms transactions.[FN2] One such location was a grocery store in the City of Schenectady, Schenectady County (hereinafter the store) that was owned and operated by an individual (hereinafter the owner) who was allegedly a leader of a subgroup of the Bloods known as the United Blood Nation and one of the individuals against whom the CI wanted revenge. The FBI agent and his team were monitoring the store and other locations for gang activity and had installed a pole camera to observe activity outside the store.
The testimony of the FBI agent and the CI established that, in April 2015, the CI called the FBI agent from the store parking lot and advised him that a long-term acquaintance whom the CI knew as Jaheim had offered to sell the CI a handgun with two loaded magazines and a box of bullets. The pole camera revealed a man and a parked car matching the CI's descriptions. The jury viewed recorded footage from this camera that appeared to show a conversation between defendant and the CI in the parking lot, and then depicted the CI getting into the rear seat of the car and the car driving out of view. At trial, the CI identified defendant in this video footage, and in the courtroom, as the man he knew as Jaheim. An investigation determined that the car had been rented in defendant's name, using defendant's address.
The CI testified that he and defendant first drove from the parking lot to a liquor store and then to defendant's residence, where Walters showed the gun to the CI.[FN3] The CI stated that defendant had "a lot of status" within the United Blood Nation and was thus able to direct Walters to handle the transaction and provide the purchase money to defendant afterward. In this way, "if anything happen[ed], [defendant's] hands [wouldn't] be dirty." The CI took photos of the gun — a .40 caliber Glock 22 — which he sent to the FBI agent later that day. These photos were entered into evidence at trial.
About 45 minutes after the first call, the FBI agent received another call in which the CI reported that he was at defendant's residence and that the "gun [wa]s legit." The CI was instructed to set up the sale; he called back 30 minutes later and advised the FBI agent that he was with defendant, who wanted $800 for the gun. The FBI agent offered a lower price and heard a "regular male voice" in the background emphatically rejecting the offer. The original price was agreed upon, and the transaction was set up for the following afternoon. The next day the CI called defendant, in the presence of the FBI agent, just before going to defendant's house to complete the transaction. An audio recording of this conversation revealed that a female answered the phone, the CI asked to speak with defendant, and the female called out for "Ja" to come to the phone.[FN4] At trial, the CI identified the voice of the man who then came to the phone as defendant's. On the recording, the CI can be heard asking defendant whether he remembered "talking about the 7 21 14 yesterday," and defendant answered, "Yeah." The CI testified that this sequence of numbers was a code used for the word gun, representing the positions of the word's letters in the alphabet. The CI then said, "[R]emember I told you I was coming through," and asked, "[Y]ou still on deck?" Defendant responded with a partially audible phrase, which may have been, "[Y]eah it's still here," as the People contend, or "[Y]eah he's still here," as defendant contends.
After the call, the FBI agent searched the CI to ensure that he had no money or contraband. Footage from a body camera worn by the CI and from pole cameras along the way showed the CI's travel to defendant's residence. Upon arrival at the front door, the CI was advised that Jaheim had gone to "Ellis." The CI asked if "homeboy" was there and if the CI could speak with him. An individual not visible to the camera then came out of the house. The CI said that he was there to see Jaheim and asked whether this individual was "up for that." The individual responded, "Yeah," and added a partially inaudible remark that sounded like "It's around back."[FN5] The CI walked around to the back of the house, where he encountered several individuals, including Walters. The CI attempted to call defendant's cell phone, but he did not answer. As described in the CI's testimony and partially revealed in the body camera footage,[FN6] Walters then completed the sale, discharging a bullet from the gun's chamber at the CI's request and then exchanging the gun, with two magazines and additional bullets, for the CI's payment. The CI took the gun, and the footage from the body camera and pole cameras showed him returning to the FBI agent's vehicle, where, according to the FBI agent, the gun, magazines and ammunition were retrieved. At trial, the CI identified these items and photographs taken of them by police. Police tested the gun and found that it was operable.
Defendant took the stand on his own behalf, denying that he participated in the gun sale. He acknowledged that the residence where the transaction took place was his home and that he had been present in the store parking lot when he appeared in the pole camera footage, but he claimed another reason for his presence at the store. He denied that he discussed anything with the CI, stating that he had instead merely agreed to give the CI a ride to a liquor store. After dropping the CI at the liquor store, he went home to make dinner and help his children with homework; he testified that the CI was never at his residence on that day. Defendant said that he left his residence the next afternoon and drove to a doctor's appointment at Ellis Hospital in the City of Schenectady, stating his time of arrival and departure. Medical records were submitted confirming this claim.
On cross-examination, defendant admitted that the aliases that the CI had used for him and Walters were accurate, and acknowledged that the CI had been at his home on an earlier occasion. He identified his voice and that of his wife on the audio recording of the phone call made by the CI just before the controlled purchase, and acknowledged that his wife sometimes called him Ja. He, however, denied that the ensuing conversation had to do with the charged gun sale, appearing to assert, in unclear testimony, that he and the CI were discussing a previous, unrecorded encounter in which the CI had asked defendant where he could get a "burner." Defendant was evasive as to whether he knew what "7 21 14" meant at the time of the phone call, but acknowledged that he did not ask about its meaning when the CI used the term. He asserted that, when the CI then asked defendant whether he was "still on deck," defendant thought that the CI was asking whether defendant was at home. He said that he responded, "[H]e's still here," rather than "[I]t's still here," as the People claimed. When asked why he gave that response and what person he meant by "he," defendant did not give a clear answer, testifying that the word could have referred to several people.
Defendant argues that the CI's credibility is in serious doubt due to his lengthy criminal history, the benefits he received for his services, and numerous alleged inconsistencies, contradictions and implausible claims in his testimony. If the jury had agreed with these contentions, a different verdict would not have been unreasonable. Thus, we "must, like the trier of fact below, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Romero, 7 NY3d 633, 643 [2006] [internal quotation marks and citations omitted]). The CI was extensively cross-examined on the issues that defendant now raises, and "the jury had ample opportunity to assess [his] testimony and credibility" (People v Peterkin, 159 AD3d 1196, 1198 [2018] [internal quotation marks and citations omitted], lv denied 31 NY3d 1151 [2018]). His testimony was partially corroborated by the audio and video recordings and the FBI agent's testimony, and it "was not incredible as a matter of law such that it should have been totally disregarded as being without evidentiary value" (People v Holliman, 12 AD3d 773, 775 [2004], lvs denied 4 NY3d 764, 831 [2005]). Thus, whether to credit the CI's assertion that defendant arranged the transaction but sought to insulate himself from criminal responsibility by directing Walters to complete the sale was a factual assessment within the province of the jury. According deference to this credibility determination, and viewing the evidence in a neutral light, we find that the verdict was not against the weight of the evidence (see Penal Law §§ 10.00 [8]; 20.00, 265.03 [3]; 265.11 [1]; People v Odom, 36 AD3d 1027, 1028-1029 [2007]; People v Holliman, 12 AD3d at 774-775; People v Hatch-Green, 20 AD3d 581, 582-583 [2005], lvs denied 5 NY3d 828, 830 [2005]).
County Court did not err in granting the People's pretrial application to permit evidence of the gang affiliations of defendant and the other participants in the gun sale. Although proof of a defendant's bad acts may not be admitted solely to demonstrate his or her propensity to commit the charged crimes, "[e]vidence regarding gang activity can be admitted to provide necessary background, or when it is inextricably interwoven with the charged crimes, or to explain the relationships of the individuals involved" (People v Kims, 24 NY3d 422, 438 [2014] [quotation marks omitted]; see People v Davis, 144 AD3d 1188, 1189-1190 [2016], lvs denied 28 NY3d 1144, 1150 [2017]; People v McCommons, 143 AD3d 1150, 1154 [2016], lvs denied 29 NY3d 999, 1001 [2017]). Here, the CI's testimony about his former gang membership, the affiliation between his gang and the Bloods and his position of trust as an enforcer explained the FBI's interest in his services as a CI. His testimony about the owner's gang affiliation provided background information that explained the FBI's surveillance of the store and the CI's presence there. As for defendant himself, evidence of his gang membership and status within the gang hierarchy helped the jury to understand why the CI felt comfortable approaching him about the gun sale and how defendant was able to arrange the sale while removing himself from physical involvement.[FN7] Notably, the testimony specifically addressing defendant's gang involvement, as opposed to that of the other participants, was limited. We thus find that the testimony was admissible to provide background information and explain the relationships of the participants in the sale, and that County Court did not abuse its discretion in finding that its probative value outweighed the potential for undue prejudice (see People v Bailey, 32 NY3d 70, 83-84 [2018]; People v McCommons, 143 AD3d at 1154; People v Johnson, 106 AD3d 1272, 1274 [2013], lvs denied 21 NY3d 1043, 1045, 1046 [2013]; People v Lee, 80 AD3d 877, 880 [2011], lvs denied 16 NY3d 832, 833, 834 [2011]).
County Court properly declined to grant a mistrial based upon the FBI agent's testimony regarding narcotics activity "in the back" of defendant's residence. "The decision to grant or deny a motion for a mistrial is within the trial court's discretion and its decision will not be disturbed unless it amounts to an abuse of discretion" (People v Conway, 179 AD3d 1218, 1220 [2020] [internal quotation marks, brackets and citations omitted], lv denied 35 NY3d 941 [2020]). Here, during cross-examination, Walters' counsel asked the FBI agent a series of questions about a name, "Moe," on a form related to payments to a confidential informant.[FN8] Ultimately, Walters' counsel asked the FBI agent to refresh his recollection by reviewing his notes, which had been marked for identification as a defense exhibit, and then asked several questions about references to "Moe" in those notes, followed by a sequence of questions about whether "he" was in the back hallway of defendant's home at the time of the sale. The FBI agent expressed confusion as to whether counsel was referring to Moe, the agent's source, or someone else, and Walters' counsel made multiple unsuccessful attempts to clarify. Walters' counsel then withdrew the original question and asked the FBI agent whether the source had told him where he was during the transaction, which the FBI agent could not recall. Walters' counsel drew his attention specifically to a certain line of his notes to refresh his recollection. The FBI agent indicated that his recollection had been refreshed, and Walters' counsel asked, "Your source said that they went into the back hallway, is that correct?" The FBI agent responded, "He believed that they were cutting narcotics in the back."
Both Walters' counsel and defendant's counsel moved for a mistrial, arguing that the reference to narcotics activity in defendant's home violated the Molineux ruling and was unduly prejudicial. County Court struck the response and denied the motion, noting, among other things, that Walters' counsel had elicited the response by drawing the FBI agent's attention specifically to a line of text that read, "[C]utting product, went in back hallway." The court offered to provide a limiting instruction, but defendant's counsel rejected the offer.
As defendant argues, the reference to narcotics was not directly responsive to the question asked, which called for a yes or no answer, and which the FBI agent later answered in the negative. However, it followed a series of questions aptly described by County Court as "confusing, ambiguous and vague," it was elicited when Walters' counsel specifically directed the FBI agent to review the line that referenced narcotics, and it was immediately stricken. Notably, the response did not directly violate the Molineux ruling, as it did not suggest that defendant or Walters were involved in cutting narcotics. Any prejudice to defendant resulting from the fact that this activity was allegedly taking place in his home was reduced by his undisputed absence from the premises at the time. Moreover, the response was given in the context of a trial record that was replete with other testimony about alleged illegal activity by gang members that was admitted without objection. We thus find that County Court did not abuse its discretion in declining to declare a mistrial (see People v Hamilton, 176 AD3d 1505, 1507 [2019], lvs denied 34 NY3d 1126, 1128 [2020]; People v Rimmen, 8 AD3d 1088, 1088 [2004], lv denied 3 NY3d 661 [2004]; People v West, 271 AD2d 806, 809 [2000], lv denied 95 NY2d 893 [2000]).[FN9]
Finally, defendant argues that County Court undermined the presumption of innocence and deprived him of his right to a fair trial by giving an interested witness instruction — modeled almost exactly upon the text of the pertinent pattern instruction — that permitted the jury to consider whether defendant's interest in the outcome of the trial affected the truthfulness of his testimony (see CJI2d[NY] Credibility of Witnesses). As defendant concedes, this argument is unpreserved for our review (see People v Piedra, 87 AD3d 706, 707 [2011], lv denied 17 NY3d 955 [2011]; People v Dees, 45 AD3d 602, 603 [2007], lv denied 9 NY3d 1032 [2008]), and we decline his request to exercise our interest of justice jurisdiction to modify the judgment on this ground.
Lynch, Clark, Aarons and Reynolds Fitzgerald, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: Defendant's alias is spelled "Jahiem" in the indictment but is spelled "Jaheim" throughout the remainder of the record.

Footnote 2: The CI testified that he was a former member of the Latin Kings, but was able to become an enforcer for the Bloods because the two gangs were affiliated.

Footnote 3: The CI consistently identified Walters by a known alias throughout his testimony.

Footnote 4: The CI identified himself during this call as "Uncle Ray" and as "[the owner's] uncle." The CI testified that these were street names given to him out of respect for his age and denied that he had any family relationship with the owner. Defense counsel cross-examined him extensively on this claim and argued in summation that the CI was lying about this relationship, his previous acquaintanceship with defendant and many other aspects of his testimony.

Footnote 5: It is unclear from the testimony whether the individual with whom the CI spoke was the person he knew as "homeboy," Walters or someone else.

Footnote 6: Much of the transaction cannot be seen but is audible in the recording.

Footnote 7: The People elicited testimony from the CI as to Walter's gang membership, but it was stricken because of the form of the question. It does not appear that such information was admitted elsewhere at trial.

Footnote 8: The testimony was unclear as to whether this informant was the CI.

Footnote 9: Defendant's appellate argument that County Court gave inadequate curative instructions is unpreserved, as he refused the court's offer for such an instruction (see People v Adams, 8 AD3d 685, 686-687 [2004], lv denied 3 NY3d 669 [2004]). To the extent that defendant argues that a mistrial should have been granted based on other trial testimony that allegedly suggested that defendant had a criminal history, defendant neither raised this argument as part of his mistrial motion nor argued on appeal that he was denied a fair trial by the cumulative effect of multiple errors. Moreover, when County Court struck the testimony in question from the record, defendant described the remedy as "fair" and rejected the court's offer for a curative instruction.