People v Doane (2023 NY Slip Op 00002)

People v Doane

2023 NY Slip Op 00002

Decided on January 5, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:January 5, 2023

110597
[*1]The People of the State of New York, Respondent,
v
Michael L. Doane, Appellant.

Calendar Date:November 14, 2022

Before:Garry, P.J., Clark, Aarons, Pritzker and McShan, JJ.

Matthew C. Hug, Albany, for appellant.
Joseph G. Fazzary, District Attorney, Watkins Glen, for respondent.

McShan, J.
Appeal from a judgment of the County Court of Schuyler County (Dennis J. Morris, J.), rendered August 3, 2017, upon a verdict convicting defendant of the crime of criminal sale of a controlled substance in the fifth degree (three counts).
Defendant was charged by indictment with three counts of criminal sale of a controlled substance in the fifth degree stemming from his sale of methamphetamine during two controlled-buy operations conducted at his home. The matter proceeded to a jury trial, at the conclusion of which defendant was convicted as charged. Defendant was sentenced, as a second felony offender, to a prison term of 2½ years on each count, to be followed by two years of postrelease supervision. Counts 1 and 3 were ordered to run consecutively, with count 2 running concurrently to count 1, for an aggregate sentence of five years. Defendant appeals, and we affirm.
Defendant first contends that his convictions are not supported by legally sufficient evidence and are against the weight of the evidence. Defendant's legal sufficiency arguments are unpreserved owing to his failure to identify the specific grounds now raised on appeal in his general motion to dismiss at the conclusion of the People's case; specifically, that the People failed to establish his identity as the seller of the recovered methamphetamine during the controlled buys and the People's failure to establish that the substance sold was indeed methamphetamine (see People v Baber, 182 AD3d 794, 795 [3d Dept 2020], lv denied 35 NY3d 1064 [2020]; People v Newman, 169 AD3d 1157, 1158 [3d Dept 2019]). "Nevertheless, a weight of the evidence challenge, which bears no preservation requirement, also requires consideration of the adequacy of the evidence as to each element of the crimes" (People v Smith, 210 AD3d 1297, 1297 [3d Dept 2022] [internal quotation marks and citations omitted]). As is relevant here, "[a] person is guilty of criminal sale of a controlled substance in the fifth degree when he [or she] knowingly and unlawfully sells a controlled substance" (Penal Law § 220.31).
At trial, the People presented testimony establishing that investigators from the State Police conducted two separate controlled buys of methamphetamine from defendant; one in August 2015 and another in February 2016. Thomas Tryon, a state trooper, testified that he participated in the August 2015 controlled buy with the aid of a confidential informant (hereinafter CI). Prior to the controlled buy, the CI was outfitted with a recording device and searched to ensure that he did not possess any contraband. The CI was also provided with $100 that he would use to purchase methamphetamine from defendant. Tryon then drove the CI to defendant's home in an unmarked vehicle. Tryon testified that, upon arriving, the CI first went into defendant's home by himself and discovered that defendant was not there, so the CI returned to the vehicle. Defendant eventually arrived and the CI proceeded with defendant into [*2]the home. The recording from the device worn by the CI was admitted into evidence, corroborating Tryon's account. The recording reflected that, while the CI was in defendant's home, the CI gave the $100 to defendant and told him that Tryon had another $100 to make a purchase. The CI asked defendant if he preferred to sell the methamphetamine directly to Tryon or if he preferred that the CI get the money and bring it to him, to which defendant responded, "I don't like selling to anybody other than somebody I know." However, Tryon testified that the CI later came out and told Tryon to come into defendant's garage, where he approached defendant and placed $100 on a coffee table that defendant was sitting behind. In response, defendant nodded to a foosball table, which Tryon approached and observed a bag of white powder that he suspected to be methamphetamine. Tryon and the CI then declined an offer from defendant to have a beer and play foosball, and returned to the vehicle, where Tryon collected the substance that the CI had purchased. Upon returning to the State Police barracks, Tryon completed a field test of both substances, which came back as positive for methamphetamine. On cross-examination, Tryon conceded that he observed two other individuals present at defendant's home and that he did not directly witness defendant place anything on the foosball table.
The CI testified to his extensive criminal record, including a history of selling methamphetamine, as well as his history of substance abuse. He confirmed that he had begun assisting the State Police following a 2013 arrest in hopes that it would help him with his pending criminal charges. The CI explained that, at the time of the August 2015 controlled buy, he was working as an informant and, after some consideration as to potential targets with his wife, she suggested that they target defendant. The CI corroborated Tryon's account of the operation, testifying that the state troopers picked him up from his home and brought him to the State Police barracks, where he was fitted with a recording device and strip searched to confirm that he did not have any contraband on his person prior to the controlled buy. Upon arriving at defendant's home and discovering that defendant was not home, he went back to the vehicle and made multiple unsuccessful attempts to contact defendant. Defendant returned shortly thereafter, and the CI proceeded into defendant's home with him. According to the CI, defendant led him to a bedroom and reached under a mattress to retrieve a pouch containing a white substance which defendant exchanged with the CI for $100. The CI also testified consistently with the recording and Tryon's account concerning defendant's initial reluctance to sell to someone he did not know. The CI testified that defendant told him that Tryon could come in but asked the CI to take the money from Tryon and pass it to him. According to the CI, defendant then placed the bag of methamphetamine on the [*3]foosball table. The CI testified that Tryon then came in and put the money on the coffee table and grabbed the bag of methamphetamine from the foosball table. After the CI and Tryon left defendant's home, they returned to the barracks and the CI was strip searched and the recording device was removed. The CI testified that while he was at defendant's home, he observed several of the necessary items for making methamphetamine. The CI also testified that in between the August 2015 controlled buy and February 2016, he made approximately five or six additional methamphetamine purchases from defendant.[FN1]
As to the February 2016 controlled buy that was the subject of count 3 of the indictment, the CI testified that he and his wife were transported to defendant's home by a state trooper after being strip searched at the State Police barracks and provided $100. Amanda Giles, a state trooper, testified that she accompanied the CI and his wife to the February 2016 controlled buy, and confirmed that they were both searched prior to traveling to defendant's home. Giles elaborated on the operation, noting that when they first arrived, the CI and his wife went into the house and returned, advising that defendant was not home. Giles then drove both the CI and his wife away from the home, searched the CI's wife, and returned to the home after they had learned that defendant had returned. The CI testified that he then encountered defendant at the door, who directed the CI and his wife to follow him to the bedroom. According to the CI, defendant asked the CI how much methamphetamine he wanted, and the CI responded, "a gram for the [$]100." Defendant handed the CI the bag and then continued bagging methamphetamine for other people in the house. The CI testified that he later realized that defendant had only given him half a gram for the $100. The CI testified that, similar to the previous controlled buy, he got back in the vehicle, turned over the substance to the trooper and proceeded to the State Police barracks, where he and his wife were again stripped searched. On cross-examination, the CI acknowledged that he had participated in the controlled buys and had cooperated with the People with the hope that he would be treated favorably, including on charges that were pending at the time of trial. The CI further acknowledged that the People had decided to stop working with the CI on account of a recent burglary charge. The People also elicited the testimony of the CI's wife, who corroborated the account of the operation. The CI's wife testified that she had known defendant for her whole life and that she had purchased methamphetamine from him on prior occasions. The CI's wife testified consistent with the CI's and Giles' accounts, noting that she entered defendant's house with the CI and proceeded to the bedroom, where defendant sold the CI methamphetamine.
The People elicited testimony from forensic scientists concerning the testing of the substances procured from [*4]the two controlled buys. The forensic scientists consistently testified to the procedures for inventorying and testing controlled substances, including the use of three distinct tests: a color test, a GC screening and a GC mass spec. Each of the forensic scientists consistently testified that testing of the substances procured from the controlled buys indicated that there was methamphetamine present in the respective samples. As to the substance sold to the CI during the August 2015 controlled buy, the forensic scientist acknowledged a mistaken reference to the substance as heroin in her report, which she attributed to an inadvertent error when she was writing up several reports in batches. The forensic scientist who tested the substance sold to the CI during the February 2016 controlled buy testified that an administrative review of her first round of testing identified inconsistent results stemming from an issue with her testing instrument. However, the forensic scientist explained that, after learning of the inconsistency, she then performed routine maintenance on the instrument and extracted a second sample, which again yielded a positive result for methamphetamine.
In our view, the foregoing establishes that defendant's convictions are not against the weight of the evidence. Defendant asserts, in general fashion, that the testimony of the forensic scientists raised doubts about the accuracy of their testing. However, defendant stops short of asserting a fatal defect in the identification of the substances as methamphetamine and, to the extent that his challenge casts doubt on the credibility of the forensic scientists' conclusions, those issues were fully explored on cross-examination and the jury had a full opportunity to evaluate their testimony (see People v Carota, 93 AD3d 1072, 1074 [3d Dept 2012]; People v Gilliam, 36 AD3d 1151, 1152 [3d Dept 2007], lv denied 8 NY3d 946 [2007]; see also People v Garrow, 171 AD3d 1542, 1546 [4th Dept 2019], lv denied 34 NY3d 931 [2019]). Specific to counts 1 and 2, defendant's contentions directed at the CI's credibility in recounting the August 2015 controlled buy fail to account for the substantial evidence corroborating the CI's testimony, including the recording of the encounter and the testimony of Tryon. Upon our independent review of the sum of evidence submitted at trial, we find that a different verdict as to counts 1 and 2 would have been unreasonable, as the evidence of defendant's guilt is overwhelming (see People v Serrano, 200 AD3d 1340, 1345 [3d Dept 2021], affd 38 NY3d 1180 [2022]). As to count 3, we find that a different verdict would not have been unreasonable, as the jury could have discredited the account of the February 2016 controlled buy provided by the CI and his wife. However, while defendant contends that the evidence revealed deficiencies in the manner in which the CI and his wife were searched prior to the controlled buy, the jury had an opportunity to consider that evidence [*5]as part of its overall assessment of the evidence presented and whether to credit their respective accounts of the operation (see generally People v Valentin, 173 AD3d 1436, 1438-1439 [3d Dept 2019], lv denied 34 NY3d 954 [2019]; People v Torres, 146 AD3d 1086, 1087 [3d Dept 2017], lv denied 29 NY3d 1087 [2017]). Accordingly, giving the appropriate deference to the jury's credibility determinations and viewing the evidence in a neutral light, we find that the verdict on count 3 is not against the weight of the evidence (see People v Smith, 201 AD3d 1126, 1131-1132 [3d Dept 2022], lv denied 38 NY3d 1035 [2022]; People v Sumpter, 191 AD3d 1160, 1162-1163 [3d Dept 2021], lv denied 37 NY3d 968 [2021]; People v Tallon, 175 AD3d 1598, 1600 [3d Dept 2019], lv denied 35 NY3d 1070 [2020]).
Defendant next argues that County Court improperly permitted the People to introduce excerpts of certain recordings of telephone calls he placed from jail, which only served to demonstrate his propensity to engage in criminal activity (see People v Molineux, 168 NY 264, 293 [1901]). "As a general rule, evidence of uncharged crimes or prior bad acts may be admitted where they fall within the recognized Molineux exceptions — motive, intent, absence of mistake, common plan or scheme and identity — or where such proof is inextricably interwoven with the charged crimes, provides necessary background or completes a witness's narrative. A court may admit such evidence only after making the discretionary determination that the probative value of the evidence outweighs the potential for prejudice to the defendant" (People v Paul, 202 AD3d 1203, 1210 [3d Dept 2022] [internal quotation marks, brackets and citations omitted], lv denied 38 NY3d 1034 [2022]; see People v Gaylord, 194 AD3d 1189, 1192-1193 [3d Dept 2021], lv denied 37 NY3d 972 [2021]). During the telephone conversations, defendant made references to various individuals bringing materials necessary for the making of methamphetamine to his home, the presence of an anhydrous ammonia tank in his home, the lingering odor of ammonia in the home and the need for his paramour to address it and the paramour's continuing sale of methamphetamine that was still present in the home. We find that this evidence satisfied several Molineux exceptions, as it was "inextricably interwoven with the charged crimes and particularly relevant and material to issues of intent to sell," an absence of mistake and defendant's ability to commit the crimes he was charged with (People v Paul, 202 AD3d at 1211; see People v Mitchell, 112 AD3d 1071, 1073-1074 [3d Dept 2013], lv denied 22 NY3d 1140 [2014]). Further, we are satisfied that County Court properly evaluated the evidence and determined that its probative value outweighed the potential for prejudice (see People v LaDuke, 204 AD3d 1083, 1088 [3d Dept 2022], lv denied 38 NY3d 1072 [2022]). As to the remainder of the discussions on the recordings challenged by defendant on this appeal — specifically[*6], defendant's frequent rumination over the potential identity of the CI, his lamenting of the existence of "snitches," the references to the apparent theft of paraphernalia from his paramour and unrelated criminal charges that a friend had previously faced — we find that the substance of those discussions falls outside of the scope of Molineux (see People v Chappell, 198 AD3d 1018, 1020 [3d Dept 2021], lv denied 37 NY3d 1160 [2022]). Further, although County Court did not provide a limiting instruction directly after the recordings were introduced, the limiting instruction provided during its final instructions to the jury properly emphasized the limited purposes for which they could consider such evidence, which adequately minimized any resulting prejudice (see People v Frumusa, 29 NY3d 364, 373 [2017]; People v Young, 190 AD3d 1087, 1093 [3d Dept 2021], lv denied 36 NY3d 1102 [2021]; People v Mitchell, 112 AD3d at 1074).
Defendant's contention that County Court's Sandoval ruling deprived him of his constitutional right to a fair trial is unpreserved owing to his failure to raise any constitutional objections before the court (see People v Grant, 7 NY3d 421, 424 [2006]; People v Giddens, 161 AD3d 1191, 1192 [2d Dept 2018], lv denied 32 NY3d 937 [2018]; People v Diaz, 50 AD3d 919, 919 [2d Dept 2008], lv denied 10 NY3d 933 [2008]). To the extent that defendant challenges the court's ruling as an abuse of discretion, we note that the People's proffer sought to cross-examine defendant, should he testify, regarding two prior felony convictions for driving while intoxicated from 1991 and 2010, and a misdemeanor assault conviction from 2006. However, although the court stated that it had weighed the probative value of those convictions against their prejudicial effect, the record before us contains no indication that the People provided the court with any details concerning the underlying facts of those convictions, which was necessary for the court to engage in the appropriate balancing (see People v Sandoval, 34 NY2d 371, 376-377 [1974]). Further, we are unable to discern the scope of inquiry permitted by the court's determination to allow "mention" of those convictions and whether that ruling reflected an appropriate compromise in light of the remoteness of the crimes (see People v Kocsis, 137 AD3d 1476, 1479 [3d Dept 2016]; cf. People v Garcia, 203 AD3d 1228, 1229-1230 [3d Dept 2022], lv denied 38 NY3d 1032 [2022]). Nonetheless, insofar as the court's ruling may have been an abuse of discretion, it would be subject to a nonconstitutional harmless error standard, which notably "does not involve speculation as to whether a defendant would have testified if the legal error had not occurred" (People v Cole, 177 AD3d 1096, 1101 [3d Dept 2019] [internal quotation marks and citation omitted], lv denied 34 NY3d 1015 [2019]). As we have already noted that "the evidence of defendant's guilt is overwhelming," and because "there is no significant probability [*7]that defendant would have been acquitted but for the error," we find that the court's Sandoval determination was harmless (People v Thomas, 136 AD3d 1390, 1391 [4th Dept 2016], lv denied 27 NY3d 1140 [2016]; see People v Grant, 7 NY3d at 424-425; People v Cole, 177 AD3d at 1101-1102).
We find no merit to defendant's contention that County Court's determination to disallow certain questions on cross-examination of the CI's wife deprived him of his right to confront his accuser. "Although a criminal defendant is guaranteed the right to confront all adverse witnesses through cross-examination, that right is not unlimited" (People v Wilson, 100 AD3d 1045, 1047 [3d Dept 2012] [internal quotation marks, brackets and citations omitted], lv denied 22 NY3d 998 [2013]; see People v Agan, 207 AD3d 861, 869 [3d Dept 2022], lvs denied 38 NY3d 1186, 39 NY3d 939 [2022]). In this respect, "[t]he trial court has broad discretion to limit the scope of cross-examination when the questions are irrelevant or only marginally relevant, concern collateral issues, or pose a danger of misleading the jury" (People v Francisco, 44 AD3d 870, 870 [2d Dept 2007], lv denied 9 NY3d 1033 [2008]; see People v Dickerson, 309 AD2d 966, 968 [3d Dept 2003], lv denied 1 NY3d 596 [2004]). During the trial, defense counsel attempted to cross-examine the CI's wife about bruising to her forehead and both eyes, which was admittedly intended to impeach the CI's prior denial that he had abused his wife. While defendant contends that the testimony would have revealed that the CI had abused his wife in order to force her to testify consistent with his own testimony, counsel did not attempt to directly impeach the CI on this point during cross-examination. Accordingly, we find no abuse of discretion in County Court's decision to foreclose defendant's attempt to impeach the CI's credibility through collateral testimony (see People v Wilson, 100 AD3d at 1047; People v Francisco, 44 AD3d at 870; People v Love, 307 AD2d 528, 532 [3d Dept 2003], lv denied 100 NY2d 643 [2003]).
Finally, we find that defendant's contention that his sentence was harsh and excessive has been rendered moot, as the records of the Department of Corrections and Community Supervision confirm that defendant has been released from prison, has been discharged from parole and has reached the maximum expiration date of his sentence (see People v Boodrow, 205 AD3d 1134, 1137 [3d Dept 2022]; People v Vivona, 199 AD3d 1165, 1166 [3d Dept 2021]). To the extent that defendant's remaining contentions are not specifically addressed herein, we have considered them and determined that they lack merit.
Garry, P.J., Clark, Aarons and Pritzker, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: County Court gave a limiting instruction following this testimony, admonishing the jury that they could not consider it as evidence that defendant was predisposed to any criminality, but that it could be considered for identification purposes and understanding the background of the case.