People v Osman (2024 NY Slip Op 03106)

People v Osman

2024 NY Slip Op 03106

Decided on June 6, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 6, 2024

113693
[*1]The People of the State of New York, Respondent,
v
Mohamed Osman, Appellant.

Calendar Date:May 3, 2024

Before:Garry, P.J., Reynolds Fitzgerald, Fisher, McShan and Powers, JJ.

Barket Epstein Kearon Aldea & Loturco, LLP, Garden City (Donna Aldea of counsel), for appellant.
Matthew Van Houten, District Attorney, Ithaca (Heidi S. Paulino of counsel), for respondent.

McShan, J.
Appeal from a judgment of the County Court of Tompkins County (John C. Rowley, J.), rendered July 1, 2022, upon a verdict convicting defendant of the crimes of attempted rape in the first degree and sexual abuse in the first degree.
In September 2021, defendant was charged by indictment with attempted rape in the first degree, criminal sexual act in the first degree, sexual abuse in the first degree and criminal obstruction of breathing or blood circulation. After a jury trial, defendant was found guilty of attempted rape in the first degree and sexual abuse in the first degree; he was acquitted of the two remaining charges. County Court later sentenced defendant, as a second violent felony offender, to a prison term of seven years, to be followed by 10 years of postrelease supervision, on each conviction, to be served concurrently. Defendant appeals.
We turn first to defendant's legal sufficiency and weight of the evidence challenges, which, in sum and substance, assert that the People failed to establish his intent and challenge the credibility of the victim's account with respect to the quantum of proof establishing his criminal conduct. "Defendant's legal sufficiency arguments are unpreserved owing to his failure to identify the specific grounds now raised on appeal in his general motion to dismiss at the conclusion of the People's case" (People v Doane, 212 AD3d 875, 876 [3d Dept 2023], lv denied 39 NY3d 1154 [2023]). "Nevertheless, in the course of reviewing defendant's weight of the evidence challenge, this Court necessarily evaluates whether all elements of the charged crimes were proven beyond a reasonable doubt" (People v Hadlock, 218 AD3d 925, 926 [3d Dept 2023] [internal quotation marks and citation omitted], lv denied 40 NY3d 997 [2023]). "When undertaking a weight of the evidence review, this Court must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and, if not, then it must weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence. When conducting this review, this Court considers the evidence in a neutral light and defers to the factfinder's credibility assessments" (People v Holmes, ___ AD3d ___, ___, 2024 NY Slip Op 02560, *2 [3d Dept 2024] [internal quotation marks, brackets and citations omitted]).
"A person is guilty of sexual abuse in the first degree when he or she subjects another person to sexual contact . . . [by] forcible compulsion" (Penal Law § 130.65 [1]). Also relevant, "a conviction for attempted rape in the first degree requires proof that the defendant intended and came dangerously close to engaging in forcible sexual intercourse with another person" (People v Butkiewicz, 175 AD3d 792, 793 [3d Dept 2018] [internal quotation marks and citation omitted], lv denied 34 NY3d 1076 [2019]; see [*2]Penal Law §§ 110.00, 130.35 [1]). "Within the context of sex offenses, forcible compulsion means to compel by either use of physical force; or a threat, express or implied, which places the victim in fear of immediate death or physical injury" (People v Starnes, 206 AD3d 1133, 1135-1136 [3d Dept 2022] [internal quotation marks, brackets and citations omitted], lv denied 38 NY3d 1153 [2022]). "Proof of forcible compulsion also satisfies the lack of consent element included not just in first-degree rape but in every offense defined under Penal Law article 130" (People v Christie, 224 AD3d 1097, 1098 [3d Dept 2024] [internal quotation marks and citations omitted]). "The element of forcible compulsion is examined through the state of mind produced in the victim, and relevant factors include the age of the victim, the relative size and strength of the defendant and victim, and the nature of the defendant's relationship to the victim" (People v Lancaster, 121 AD3d 1301, 1303 [3d Dept 2014] [internal quotation marks and citations omitted], lv denied 24 NY3d 1121 [2015]).
The trial testimony established that defendant and the victim met while attending university together, during which the victim engaged defendant in a consensual sexual relationship. As part of that relationship, the two would spend time together exclusively in defendant's dormitory room, where they would engage in what the victim described as "rough sex," including acts such as "choking." The victim explained that she and defendant engaged in such acts approximately three or four times during the fall 2020 semester. Defendant decided to leave campus later that semester as classes were being held virtually due to the COVID-19 pandemic. However, the two stayed in touch through text messages and occasional telephone calls through August 2021.
According to the victim, on the date of the incident, she received a phone call from defendant asking if he could come over to her apartment because he was in the neighborhood, to which the victim said yes and provided her address. The victim noted that this was different than their prior interactions, which all occurred at night in defendant's dorm room. After defendant had entered and ate something in the victim's kitchen, he sat on the victim's couch with her, picked her up onto his lap and began kissing and sucking on her neck. At that point, the victim first disclosed to defendant that she had begun dating someone and that she "didn't want to ruin things," to which defendant replied "he doesn't have to know" and that it "[could] be [their] little secret." The victim acknowledged that she was laughing throughout the encounter, which she suggested was the way she generally acted when she was nervous.
The victim then went to the bathroom to continue preparing to go to class while defendant took a phone call and walked away briefly. Defendant subsequently entered the bathroom with the victim while he was still on the phone and resumed making advances [*3]by grabbing the victim's neck from behind and thrusting into her backside. According to the victim, she "told [defendant] no" and "asked him to stop," making sure to "be quiet so that [she] wouldn't be heard on his phone call." Defendant continued trying to place his hands under the victim's clothing, prompting her to elbow him in the chest which caused him to stop. The victim then went upstairs to her room and defendant followed her, where he proceeded to sit in a netting type of seat featured in the wall next to her bed. While sitting, defendant motioned the victim to sit next to him, to which she obliged. The two conversed briefly until defendant began to touch and rub her legs and she told him to stop. The victim stood up to move away and defendant then forced her onto the bed, where he tried to physically disrobe her. The victim testified that she again said no and asked him to stop multiple times, which went unheeded. Defendant then tried to reach down her shorts and the victim stopped him by squeezing her legs together. After forcing his hands into her shorts, defendant then grabbed her hand and placed it on his penis, attempting to force her hand up and down. The victim was able to remove her hand, at which point defendant, after touching his own penis briefly, "rub[bed] his own semen on his fingers" and "shoved his fingers down" her throat. She stated that defendant then grabbed both of her legs and put them on either one of his shoulders and tried to take her pants down again and, despite her physical resistance, he proceeded to try and move her shorts and underwear to the side and put his penis in her vagina. The victim explained that she successfully was able to thwart his efforts by moving around, at which point defendant digitally penetrated her. The victim reiterated that she sternly asked him to stop but that her "voice was a little bit shaky because [she] was pretty scared." After squeezing her neck with his arm and insisting that she tell him she was enjoying herself, he began rubbing his penis on her lips. The victim explained that she tried clenching her mouth shut, but defendant forced his penis into her mouth. She testified that defendant then laid down to the side of her and, after he attempted to pull her back again, she quickly asked him to drive her to class, which he obliged and ended his efforts at pursuing sexual contact. According to the victim, upon arriving at her class she exited defendant's car, "went for a hug" and grabbed her things. However, after realizing she had forgotten something, she went back to the car "and he got in [her] face and . . . kissed [her]," after which she proceeded to her class.
Later that day, the victim sent a text message to defendant asking when he was coming back to her apartment to get a drink he had left behind. A few days later, the victim told defendant through text message that she was uncomfortable during the incident and that she had told him "no and to stop multiple times." Defendant [*4]replied "You said no, not stop. I stop at stop," and that she "could've fooled [him] with all the laughing!" Similarly, in response to the victim's statement that "the whole situation felt a lot rapey and that's what ma[de] [her] uneasy," defendant said "[t]he laughter and smiling sent a COMPLETELY different message." The victim then noted that "looks/actions can be deceiving." After further conversation, defendant wrote that if she was "actually all uncomfortable, then [he would] be the first to say I'm sorry." Defendant also again noted that the victim was laughing throughout, and she replied that she "was serious but it's hard to be that around [him] since [he is] funny." Further, the People introduced a recording of a controlled call between the victim and defendant during which defendant acknowledged that the victim said no at certain points during the encounter. Defendant, however, continuously insisted that he had misread the situation based upon the victim's laughter and smiling. Defendant stated that, according to his understanding of their relationship prior to the incident, he and the victim "had [a] rapport established," that the intimate interactions between the two "would get a little rough," and that he "already [knew] what she's cool and what she's not cool with."
On these facts, although a different verdict would not have been unreasonable had the jury not credited the victim's account or accepted defendant's belief that he had misread the situation and, accordingly, did not act with the requisite intent (see generally People v Odu, 211 AD3d 1340, 1342-1343 [3d Dept 2022]), we do not believe that the verdict is against the weight of the evidence. To this end, the element of forcible compulsion was established by the victim's testimony that defendant attempted to pry her legs apart and engage in vaginal intercourse (see People v Christie, 224 AD3d at 1100; People v Dennis, 221 AD3d 1278, 1279 [3d Dept 2023], lv denied 40 NY3d 1091 [2024]) as well as the victim's testimony recounting defendant forcing his penis into her mouth (see People v Dickinson, 182 AD3d 783, 787 [3d Dept 2020]; People v Hartle, 159 AD3d 1149, 1151-1152 [3d Dept 2018], lv denied 31 NY3d 1082 [2018]). With respect to the probative force of the evidence presented, we note that certain aspects of the victim's testimony ostensibly could have provided a foundation for the jury to determine that defendant did not act with the requisite intent and that the sexual conduct was consensual in light of the nature of their prior intimate history. Nevertheless, the jury was able to assess such evidence and weigh it against the victim's testimony reflecting her physical resistance to defendant's conduct, which would serve to establish the element of forcible compulsion (see People v Christie, 224 AD3d at 1100; People v Scanlon, 52 AD3d 1035, 1038 [3d Dept 2008], lv denied 11 NY3d 741 [2008]). To the extent that defendant suggests that the victim's account was incredible as a [*5]matter of law, we reject that premise, as any discrepancies in her testimony fall short of establishing that it must be entirely disregarded (see People v Karnes, 223 AD3d 1119, 1122 [3d Dept 2024]; People v Rivera, 206 AD3d 1356, 1358 [3d Dept 2022], affd 39 NY3d 1062 [2023], cert denied ___ US ___, 143 S Ct 2675 [2023]). In sum, "after conducting an independent review of the evidence and according great deference to the jury's assessment of the credibility and demeanor of the witnesses, we conclude that the jury's finding that defendant overcame his victim['s] will by forcible compulsion was not against the weight of the evidence" (People v Sehn, 295 AD2d 749, 751 [3d Dept 2002], lv denied 98 NY2d 732 [2002]; see People v Dennis, 221 AD3d at 1281; People v Sharlow, 217 AD3d 1120, 1122 [3d Dept 2023], lv denied 40 NY3d 1013 [2023]; People v Diaz, 213 AD3d 979, 982 [3d Dept 2023], lv denied 40 NY3d 928 [2023]; People v Rivera, 206 AD3d at 1358; People v Copp, 184 AD2d 859, 860 [3d Dept 1992], lv denied 80 NY2d [1992]).
However, we do find that defendant has raised a meritorious contention in asserting that the People improperly alluded to defendant's prior conviction and prison sentence without a Ventimiglia ruling in advance and whether such proof was admissible at all. Evidence of a defendant's prior bad act or crime is inadmissible to establish a defendant's criminal propensity or bad character, but "may be admissible if it is probative of some other material issue or fact in the case and its probative value outweighs any undue prejudice" (People v Knox, 167 AD3d 1324, 1325-1326 [3d Dept 2018], lv denied 33 NY3d 950 [2019]). "When the People seek to admit evidence of a defendant's prior bad acts or crimes in their direct case, they must make a Ventimiglia showing before presenting the proof in front of a jury. In a Ventimiglia analysis, the trial court addresses first whether the evidence is relevant to a pertinent issue (a question of law typically involving Molineux exceptions) and then makes the discretionary determination whether the probative value outweighs the risk for real prejudice" (People v Gaylord, 194 AD3d 1189, 1193 [3d Dept 2021] [internal quotation marks and citations omitted], lv denied 37 NY3d 972 [2021]).
Prior to trial, the People submitted a Sandoval proffer, seeking to introduce, should defendant testify, evidence about his prior conviction for burglary in the second degree for which he was sentenced to a prison term of 42 months. More specifically, the People sought permission to reference the underlying facts of the conviction, which purportedly involved defendant and his friends entering a home without permission to host a party. In ruling on the People's proffer, County Court fashioned a Sandoval compromise that limited the scope of questioning to the existence of the conviction and when it occurred, with no information about "the title, the classification, the violent nature under the Penal Law [or] the sentence . .[*6]. as well as underlying facts, unless the defense were to open the door with regard to those issues." In spite of that ruling, in their opening statement, the People stated that, during the encounter but prior to any sexual assault, defendant "disclosed something unexpected, something that jarred [the victim]"; specifically, that "he had spent several years in prison." Defendant lodged an immediate objection and County Court advised the jury to disregard the comment. At side bar, County Court admonished the People, suggesting that it had been "sandbagged" by the introduction of such evidence without warning, noting the lack of an advanced ruling that they intended on eliciting that statement. Defendant accordingly requested a mistrial, arguing the prejudicial nature of the statement and, in line with the court's sentiment, that the People had only submitted a Sandoval application concerning the statement which had caught the defense by surprise. After a brief colloquy, County Court adjourned and continued discussions out of the presence of the jury. The court then considered the arguments and, ultimately, determined that it would have permitted the statement had a pretrial motion been made and that it would give a curative instruction.[FN1]
We find that the People's introduction of the statement referencing defendant's prior incarceration without first seeking an advanced Ventimiglia ruling was improper (see People v Moore, 59 AD3d 809, 811-812 [3d Dept 2009]; see also People v Gaylord, 194 AD3d at 1193; People v Holloway, 185 AD2d 646, 647 [4th Dept 1992], lv denied 80 NY2d 1027 [1992]). While County Court's Sandoval compromise was limited to the introduction of such evidence on cross-examination, it directly addressed the proof at issue; specifically, the allowable reference to defendant's prior conviction. To this point, the People's contention that the evidence was not subject to a prior ruling as it was part of the criminal conduct itself runs contrary to the fact that the Sandoval proffer on this exact evidence before trial reflected that it was subject to a discretionary determination as to whether the probative value outweighed the risk for real prejudice. Thus, the People effectively deprived defendant of the benefit of such analysis prior to introduction of the evidence by circumventing the Sandoval ruling (see People v Jay, 187 AD2d 454, 456 [2d Dept 1992], lv denied 81 NY2d 841 [1993]; People v Sellars, 74 AD2d 551, 552 [1st Dept 1980]; see also People v Jones, 278 AD2d 246, 248 [2d Dept 2000], lv denied 96 NY2d 831 [2001]).
We also find that County Court erred in determining that the evidence was integral to the victim's narrative or "inextricably interwoven" with the offending conduct and thus admissible under a Molineux exception (People v Cuadrado, ___ AD3d ___, ___, 2024 NY Slip Op 02559, *6 [3d Dept 2024] [internal quotation marks and citations omitted]; see People v Young, 190 AD3d 1087, 1092 [3d Dept 2021], lv denied 36 NY3d 1102[*7][2021]). The People confirmed that when the case was presented to the grand jury, the theory of the case was premised on the use of physical force to establish the element of forcible compulsion. In fashioning its jury instructions, County Court confirmed as much, noting that the People's theory did not involve, and there was no evidence of, a threat to the victim, a sentiment to which the People voiced no opposition (see generally People v Odu, 211 AD3d at 1342). Moreover, the People's suggestion that the statement was a precursor to defendant's use of physical force is misplaced considering the victim's reaction to the statement; specifically, in her statement to law enforcement precipitating the charges and later in her direct testimony, the victim characterized the statement as "weird," and only first indicated on cross-examination that she felt it may have been an "intimidation tactic." To this point, she acknowledged that defendant had divulged the underlying facts that resulted in his incarceration and, ultimately, the victim explained that the statement made her feel uncomfortable, but not scared or threatened. Accordingly, the People could have presented the facts establishing forcible compulsion without the statement and, while that factor is not necessarily dispositive to its admissibility, the evidence itself was not an instrumental component of the victim's narrative and therefore inadmissible for that purpose (see People v Park, 12 AD3d 942, 944 [3d Dept 2004]; compare People v Brewer, 28 NY3d 271, 275-276 [2016]; People v Justice, 99 AD3d 1213, 1215 [4th Dept 2012], lv denied 20 NY3d 1012 [2013]; People v Galarza, 59 AD3d 365, 366 [1st Dept 2009], lv denied 12 NY3d 853 [2009]).[FN2] Even if the evidence of the statement was admissible under this exception, we find that its minimal probative value was outweighed by its prejudicial effect in light of the conflicting evidence in this case, which turned entirely on the credibility of the victim (see People v Hebert, 218 AD3d 1003, 1010 [3d Dept 2023], lv denied 40 NY3d 1080 [2023]; People v Harvey, 203 AD3d 551, 552 [1st Dept 2022], lv denied 38 NY3d 1071 [2022]; People v Saxe, 174 AD3d 958, 961 [3d Dept 2019]; People v Cole, 186 AD2d 966, 967 [3d Dept 1992]; see also People v Coppolo, 30 AD3d 207, 209 [1st Dept 2006]).[FN3]
For those same reasons, we similarly reject the People's suggestion that the error was harmless as the trial evidence was not overwhelming (see People v Telfair, 41 NY3d 107, 118 [2023]; People v Crimmins, 36 NY2d 230, 241-242 [1975]; People v Moore, 59 AD3d at 813). Further, the manner in which defendant's statement was introduced and the effect on defendant's trial strategy, considered cumulatively, establish that there was a 
significant probability that the error contributed to defendant's conviction (see People v Baker, 51 AD3d 1047, 1050 [3d Dept 2008]; compare People v Velett, 205 AD3d 1143, 1146-1147 [3d Dept 2022], lv denied 39 NY3d 988 [2022]; People v Damon, 200 AD3d [*8]1323, 1326 [3d Dept 2021]). Finally, although defendant initially contended that no curative instruction could ameliorate the harm done by the introduction of such evidence, the content of the Court's curative instruction went unopposed after it was given and, therefore, this aspect of defendant's argument is unpreserved (see People v Rizk, 146 AD3d 523, 524 [1st Dept 2017], lv denied 29 NY3d 952 [2017]; People v Ware, 28 AD3d 1124, 1125 [4th Dept 2006], lv denied 7 NY3d 852 [2006]; see also People v Hilts, 187 AD3d 1408, 1416 n 9 [3d Dept 2020], lv denied 36 NY3d 973 [2020]). Nevertheless, in assessing whether the People improperly introduced the evidence of defendant's prior conviction and whether the error was compounded by the subsequent ruling, we need only note that we do not believe the instruction was sufficient to nullify the effect on the jury (see People v Cavallerio, 71 AD2d 338, 342 [1st Dept 1979]; compare People v Williams, 306 AD2d 691, 693 [3d Dept 2003], lv denied 1 NY3d 582 [2003]). Accordingly, we find that the judgment must be reversed and a new trial ordered.
Garry, P.J., Reynolds Fitzgerald, Fisher and Powers, JJ., concur.
ORDERED that the judgment is reversed, on the law, and matter remitted to the County Court of Tompkins County for a new trial.

Footnotes

Footnote 1: During the victim's testimony, she testified that while the two were in her room defendant mentioned that he went to prison. Defense counsel objected to any mention of defendant's imprisonment but, upon hearing the People's proffer and realizing that the court was denying his objection, limited the request to prohibiting the amount of years defendant was imprisoned from being admitted through the victim's testimony. County Court granted that request and limited the allowable testimony to "he threw a big party, [the victim] didn't hear about it, it was pretty cool. And we'll leave it at that."

Footnote 2: The People, for the first time on appeal, suggest that the statement was admissible to the extent that it established defendant's intent. That assertion is unpreserved, as it was not raised to County Court as a basis for admission and, in any event, we find it lacking in merit. The People proceeded with a theory of physical force to establish defendant's forcible compulsion and, to that end, the manner in which defendant reflected on his past conviction stemming from throwing a party is not indicative of his intent to physically overcome the victim's will; rather, the facts that bore out that intent were inferable from the conduct itself (see People v Weinstein, ___ NY3d ___, ___, 2024 NY Slip Op 02222, *10 [2024]; People v Hunter, 32 AD3d 611, 612 [3d Dept 2006]).
Footnote 3: The People contend that they did not introduce any evidence of defendant's actual conviction; rather, they simply characterize the statement as a precursor to defendant's physical conduct. We reject that argument, as it reflects a distinction without a difference in terms of the potential effect on the verdict when considering the evidence in this case. Moreover, in our view, County Court's curative instruction, as well as the evidence adduced at trial concerning the statement, provided a strong inference that defendant had indeed been previously convicted and incarcerated.